## CORNELL STEAMBOAT CO. *v.* UNITED STATES ET AL.

No. 384. Argued March 1, 2, 1944.—Decided April 3, 1944.

*Mr. Robert S. Erskine* for appellant.

*Mr. Robert L. Pierce,* with whom *Solicitor General Fahy, Assistant Attorney General Berge,* and *Messrs. Walter J. Cummings, Jr., Daniel W. Knowlton,* and *Edward M. Reidy* were on the brief, for the United States et al.; *Mr. Christopher E. Heckman* argued the cause, and *Mr. James A. Martin* was on the brief, for the National Water Carriers Association, Inc.,—appellees.

MR. JUSTICE BLACK delivered the opinion of the Court.

Cornell operates tugboats for hire on the Hudson River and in and about New York harbor. Its tugs carry no cargo but move scows, barges, and similar vessels belonging to others which themselves usually carry cargo. This towing service Cornell offers to perform for the public in general. About ninety-five per cent of the vessels which it serves are moved from points in New York to other points in the same State, but these movements generally traverse New Jersey as well as New York waters. Part III of the Interstate Commerce Act[1] provides that contract or common carriers by water in interstate commerce are subject to the Act's regulating provisions. In appropriate proceedings the Interstate Commerce Commission held Cornell's business covered. 250 I. C. C. 301; 250

---

[1] Transportation Act of 1940, c. 722, 54 Stat. 898, 929.

I. C. C. 577.  A three judge District Court sustained the Commission's order.  53 F. Supp. 349.  The case is here on direct appeal.  28 U. S. C. §§ 47a, 345.

*First.*  Cornell argues that its towboats are not "water carriers" within the meaning of Part III of the Act.  Looking at Part III, we find that, read together, §§ 302 (c), (d) and (e) define a "water carrier" as any person who engages in the "transportation by water . . . of . . . property . . . for compensation."  Section 302 (h) defines "transportation" as including "all services in or in connection with transportation," as well as "the use of any transportation facility."  Any "vessel," which means any "watercraft," § 302 (f), is such a facility.  § 302 (g).  Congress has thus carefully and explicitly set out the conditions which in combination describe the kinds of carriers it intended to subject to regulation.  Cornell's tugboats fall squarely within the description.  If further proof of this be needed, §§ 303 (f) (1) and (2) expressly exempt from regulation under Part III certain types of towage service, but not that such as Cornell provides.  Congress hardly would have exempted some towers, as it did in these sections, had it intended to exempt all towers.

Nevertheless, Cornell argues that the Act's language, which appears on its face plainly to include transportation by means of towers, should not be so construed.  In support of this contention, it is said that towers do not have that common law or statutory liability to shippers which generally attaches to common carriers, see *Sun Oil Co.* v. *Dalzell Towing Co.,* 287 U. S. 291; cf. *The Murrell,* 200 F. 826; and that a "carrier" has been judicially defined as one who undertakes to transport the goods of another, a definition not inclusive of Cornell, since it does not make contracts to carry goods but only to move vessels which have goods on them.  See *Sacramento Navigation Co.* v. *Salz,* 273 U. S. 326, 328; *The Propeller Niagara* v. *Cordes,*

21 How. 7, 22. But the authorities relied upon by Cornell are of little or no assistance here. The case at bar does not require that we determine at large the legal obligations of a tower or define the usual characteristics of a carrier. We are called upon only to interpret a single Act of Congress. With unquestioned power to regulate Cornell's business, Congress in this Act has given its own definition to Cornell's activities in words literally inclusive of those activities, and which operate to subject to the Act interstate activities in the business of towing, which at common law was a common calling. *Sproul* v. *Hemmingway*, 14 Pick. 1, 6. The Act in which Congress has included this definition is designed, not to determine the legal status of vessels for all purposes,[2] but to provide for regulation of the rates and services of competing interstate water carriers as part of a broad plan of regulation for all types of competing interstate transportation facilities. Cornell is in active competition with other types of interstate water carriers as well as with trucks and railroads. Therefore, if Cornell's particular method of providing water transportation facilities for others is not subject to regulation under the Act, it would appear to present an anomalous exception to the Congressional plan for regulation of competing transportation activities. We conclude that the language of the Act brings Cornell's business within its coverage, and that to construe the Act otherwise would frustrate the purpose of Congress.

*Second.* Cornell argues that even if it is covered by Part III of the Act, there was error in holding it to be a "common" rather than a "contract" carrier. Section 302

---

[2] Compare § 320 (d) of Part III of the Act: "Nothing in this part shall be construed to affect any law of navigation, the admiralty jurisdiction of the courts of the United States, liabilities of vessels and their owners for loss or damage, or laws respecting seamen, or any other maritime law, regulation, or custom not in conflict with the provisions of this part." 49 U. S. C. § 920 (d); 54 Stat. 950.

(d) defines a "common carrier" as one "which holds itself out to the general public to engage in the transportation by water . . . of . . . property . . . for compensation." The Commission found from evidence offered that Cornell did so hold itself out to the general public. Upon review the District Court held the Commission's finding was supported by substantial evidence. The opinions of the Commission and the District Court showed the evidence relied on and it is unnecessary to repeat it here. Sufficient it is to say that we agree with the District Court's conclusion.

*Third.* The five per cent of Cornell's business which consists of moving vessels between New York and New Jersey ports is unquestionably covered by the Act, because § 302 (i) (1) specifically includes transportation "wholly by water from a place in a State to a place in any other State." [3] But about ninety-five per cent of the vessels towed by Cornell are picked up at New York ports and pulled to other ports in the same State. Cornell contends that none of these movements come within the Commission's jurisdiction. We accept findings of the Commission and the District Court that at least a substantial proportion of these latter movements regularly and ordinarily pass over New Jersey territorial waters. While moving on New Jersey waters, Cornell's vessels are not

---

[3] This section should be read together with §§ 303 (j) and (k) of Part III which are as follows:

"(j) Nothing in this part shall be construed to interfere with the exclusive exercise by each State of the power to regulate intrastate commerce by water carriers within the jurisdiction of such State.

"(k) Nothing in this part shall authorize the Commission to prescribe or regulate any rate, fare, or charge for intrastate transportation, or for any service connected therewith, for the purpose of removing discrimination against interstate commerce or for any other purpose."

The words "intrastate commerce" and "intrastate transportation" as used in these two subsections are not expressly defined in Part III.

at that time at "a place" in New York. Certain of its towing activities therefore actually move vessels from places in New York to places in New Jersey and thence back to places in New York. Such movements, if made on land by rail carriers, would be classified as interstate for regulatory purposes under previous decisions of this Court;[4] and, as the Commission's opinion points out, these decisions have cast grave doubts upon the power of a single state to regulate such movements in whole or in part. Water transportation between two ports of a single state may touch many other states, and pass through hundreds of miles of other states' waters, far removed from the state in which the terminal ports of the voyage are located. Power of the Commission to regulate such movements appears to come well within the broad purposes declared by Congress in passing legislation designed comprehensively to coordinate a national system of all types of transportation. We are unpersuaded that Congress has inadvertently left such a gap in its plan as acceptance of Cornell's argument would create.

The pertinent language Congress used in defining what should be interstate commerce in Part III of the Act reg-

---

[4] *Hanley* v. *Kansas City Southern Ry. Co.*, 187 U. S. 617. The rule of the *Hanley* case has not been changed by the cases holding that companies engaged in such transportation movements are subject to taxation by the state where the terminal points are located. See *Cornell Steamboat Co.* v. *Sohmer*, 235 U. S. 549; *Lehigh Valley R. Co.* v. *Pennsylvania*, 145 U. S. 192; *Ewing* v. *Leavenworth*, 226 U. S. 464, 468–469.

Compare *Wilmington Transportation Co.* v. *Railroad Comm'n*, 236 U. S. 151, 155–156, which held that transportation on the high seas between two points within the state of California, Santa Catalina Island and San Pedro, being "local" and not involving "passage through the territory of another state," was subject to rate regulation by California in the absence of controlling federal legislation.

For a general survey of state and federal legislation pertaining to regulation of water carriers, see Regulation of Transportation Agencies, Senate Document No. 152, 73d Cong., 2d Sess., pp. 5–13, 98–170.

ulating water carriers is to all practical intents and purposes the same as it used in Part I regulating rail carriers.[5] Part III of the Act, including this definition, first was drafted in the House Committee on Interstate Commerce as part of a general revision of an omnibus transportation bill (S. 2009) proposed by the Senate Committee on Interstate Commerce.   See H. R. No. 1217, 76th Cong., 1st Sess. In reporting on the provisions of Part III, the House Committee, a body well acquainted with transportation legislation, made the statement that, "Most of the regulatory provisions included in the new part III were modeled on provisions of part I dealing with the same subject."   *Id.*, p. 18. At the time of this report, the definition of interstate commerce in Part I upon which that in Part III was modeled had long before been interpreted both by the Commission and the courts as broad enough to cover railroad movements which pass through the territory of two states, even though the freight be carried from a place in one state to another place in the same state.   *Missouri Pacific R. Co.* v. *Stroud*, 267 U. S. 404.[6]

Parts I, II, and IV of the Interstate Commerce Act, relating respectively to regulation of rail carriers, motor carriers, and freight forwarders, explicitly or by judicial interpretation cover all shipments which pass through the territory of two or more states even though both terminal points are in the same state.[7]   And so if railroads or truck-

---

[5] See Note 7, *infra*.

[6] See also Wells-Higman Co. *v.* St. Louis, I. M. & S. Ry. Co., 18 I. C. C. 175, 176; Willman & Co. *v.* St. Louis, I. M. & S. Ry. Co., 22 I. C. C. 405; Security Cement & Lime Co. *v.* Baltimore & Ohio R. Co., 113 I. C. C. 579; *United States* v. *Delaware, L. & W. R. Co.*, 152 F. 269, 271–272 (C. C. S. D. N. Y.).

[7] Part I, § 1 (1) of the Act confers jurisdiction over "transportation . . . wholly by railroad . . . from one State . . . to any other State." 49 U. S. C. § 1 (1); 24 Stat. 379 as amended.   As previously stated this has been construed to include transportation starting in one

ers should use tugs for the same purposes and over the same route as Cornell the movements would be interstate under the Act and subject to regulation by the Commission; and apparently the same is true of freight forwarders. From the language of Part III of the Act, its history, and its general purpose, we conclude that the Commission and District Court correctly decided Cornell's transportation through New York and New Jersey waters also is subject to regulation by the Commission.[8]

*Affirmed.*

MR. JUSTICE FRANKFURTER, dissenting in part:

When in 1940 Congress provided for the regulation of water carriers in interstate and foreign commerce, it defined "transportation in interstate . . . commerce" for

---

state, passing through a second state, and returning to the first state. See Note 6, *supra.*

Part II, § 203 (a) (10) of the Act defines the "interstate commerce" by motor vehicle over which the Commission has jurisdiction as including "commerce . . . between places in the same State through another State. . . ." 49 U. S. C. § 303 (10); 49 Stat. 543, 544, as amended.

And Part IV, § 402 (a) (6) defines that transportation which shall be deemed "interstate commerce" for the purpose of regulation of freight forwarders as including "transportation . . . between points within the same State but through any place outside thereof." 49 U. S. C. § 1002 (a) (6); 56 Stat. 284, 285.

[8] As reported in the Senate, the original omnibus transportation bill (S. 2009) contained a single definition of "interstate commerce" applicable alike to rail, motor, and water carriers. This definition embodied the holding of the *Stroud* case (267 U. S. 404) cited in our opinion by expressly including "transportation . . . between places in the same State by a route . . . passing beyond the borders of said State." § 3 (25), Bill S. 2009, reported to the Senate May 16, 1939. It has been suggested that the failure of the House Committee's revision of Bill S. 2009 to retain this part of the definition contained in the original bill indicates an intention that the rule of the *Stroud* case should not apply to water transportation. In reaching our conclusion in the present case,

the purpose of such regulation to mean "transportation of persons or property—(1) wholly by water from a place in a State to a place in any other State, whether or not such transportation takes place wholly in the United States." § 302 (i) (1) of the Transportation Act of 1940, 54 Stat. 898, 929, 49 U. S. C. § 902 (i) (1). To the extent that the decision of the Court construes the field of regulation thus defined by Congress to include tugboats moving on the Hudson River from place to place in New York simply because they leave the New York boundary of the river and navigate on what are deemed Jersey waters, I dissent.

we have considered this suggestion and have rejected it for several reasons.

In the first place, the House Committee's failure to retain in Part III the particular language of the definition of "interstate commerce" in original S. 2009 is sufficiently explained by the fact, noted in the body of our opinion, that the Committee modeled Part III, not upon the provisions of original S. 2009, but upon the existing Part I of the Act. And from the report of the House Committee, a body experienced in matters of transportation legislation, we may fairly infer that, in thus using the language of Part I, it had in mind the same objective as the Senate Committee which drafted the original S. 2009, namely to save "so far as possible the existing language so that full advantage may be taken of the many interpretations, both judicial and administrative, which have been put upon the respective sections." See S. R. No. 433, 76th Cong., 1st Sess., p. 4; and H. R. No. 1217, 76th Cong., 1st Sess., pp. 18–19. Cf. *McLean Trucking Co.* v. *United States,* 321 U. S. 67, 77–80.

Furthermore, had the experienced House Committee intended to place in Part III a definition of "interstate commerce" different in scope from that in Part I, it hardly would have expressed such an intention by adopting substantially the identical language of Part I. But neither the House nor the Senate Committee appears to have had any such intention. As shown by their reports and the language of the bills which they drafted, the intention of both Committees, and of Congress, was to provide for regulation of the same sort of interstate water shipments as already were being regulated in the case of interstate rail shipments. See H. R. No. 1217, *supra;* S. R. No. 433, *supra.*

The problem is here, as it was before the Commission, for the first time. And the Court's duty of construction is not aided by the light of continuous administrative practice, though of course even the initial conclusion by the Commission on such a question of law should have its weight. But since the matter ultimately turns on general considerations regarding the manner in which legislation should be construed, I deem it appropriate to add a few words to the views expressed by Commissioner Splawn that Part III of the Interstate Commerce Act does not bring within the regulatory powers of the Interstate Commerce Commission transportation on a boundary stream between points in the same State merely because a water carrier crosses a state boundary in a stream.

The terms by which Congress conferred jurisdiction upon the Commission successively over rail carriers, motor carriers and water carriers are different. In a field so well trodden as this, involving as it does the distribution of authority as between States and Nation over transportation facilities of interest to both governments, one would suppose that only the environment of legislation and the history of its enactment could dislodge the natural assumption that different literary roads taken by Congress had different objectives. For we are here concerned with three different definitions having different genealogies in the general field of regulation incorporated in one piece of legislation, namely the Transportation Act of 1940. There is nothing in the legislative history of the extent of the power over transportation by water carriage committed to the Commission to show that Congress meant that the phrasing which it employed was in purpose to be identic with the different phrasings Congress used as to rail and motor carriers. The legislative history indicates the contrary.

The Cullom Act of 1887, as is well known, was in direct response to *Wabash, St. L. & P. Ry. Co.* v. *Illinois,* 118

644

U. S. 557. That decision rested fundamentally on the view that rail transportation has a physical unity and to such an extent that, as held very early, regulation of rail rates cannot be "split up" between two States or left only to one State even as to transportation which begins and ends in the same State but passes through the territory of another. See *Hanley* v. *Kansas City Southern Ry. Co.*, 187 U. S. 617. The terms in which Congress granted regulatory power over railroads to the Interstate Commerce Commission reflected this view. The Commission was authorized to regulate rail transportation "from one State . . . to any other State," but the provisions of the Act were not to apply "to the transportation . . . wholly within one State . . ." § 1 of the Act to Regulate Commerce, 24 Stat. 379, 49 U. S. C. §§ 1 (1), (2) (a). When Congress in 1935 brought motor carriers within the regulatory powers of the Commission, it was not content to define the scope of the transportation to be regulated in terms of the scope of the regulated railroad transportation. It defined the motor transportation to be regulated to include "commerce between any place in a State and any place in another State or between places in the same State through another State." § 203 (a) (10) of the Motor Carrier Act of 1935, 49 Stat. 543, 544, 49 U. S. C. § 303 (a) (10). It used this explicit and precise language because the conditions of motor transportation in relation to state control differ from the conditions of interstate railroad transportation, and it wished to leave no doubt whatever that it was regulating rates on motor transportation within the same State through another. The same explicitness was again used by Congress when in 1942 it swept freight forwarders who serve interstate transportation within federal control. § 402 (a) (6), 56 Stat. 284, 285, 49 U. S. C. (Supp. 1942) § 1002 (a) (6).

A totally different situation was presented to Congress by the heavy water traffic on boundry streams through-

out the country. In his report as Federal Coordinator of Transportation, the late Commissioner Eastman pointed out that thirty-two States had laws regulating water transportation "on inland waters and in some instances on bordering streams or lakes and coastal waters." Sen. Doc. No. 152, 73d Cong., 2d Sess., p. 158. This Court, in *Port Richmond Ferry Co.* v. *Hudson County,* 234 U. S. 317, had occasion to call attention to this lively water traffic which, throughout our history, presented "a situation essentially local requiring regulation according to local conditions." 234 U. S. at 332. For that reason it sustained state regulation of ferry rates even for transportation from one State to another.[1] The doctrine of *Hanley* v. *Kansas City Southern Ry. Co., supra,* is thus a doctrine applicable to railroads and has not been applied to water carriers. See *Wilmington Transportation Co.* v. *Railroad Comm'n,* 236 U. S. 151, 155–156.

In 1940 Congress did undertake to regulate water transportation. But in view of the different ways in which rail, motor and water transportation are entangled with state interests and therefore state authority, it becomes vital to heed the exact language in which Congress expressed its purpose of regulation and the manner in which it finally passed the provisions by which it defined the Commission's authority.

---

[1] "It has never been supposed that because of the absence of Federal action the public interest was unprotected from extortion and that in order to secure reasonable charges in a myriad of such different local instances, exhibiting an endless variety of circumstance, it would be necessary for Congress to act directly or to establish for that purpose a Federal agency . . . The practical advantages of having the matter dealt with by the States are obvious and are illustrated by the practice of one hundred and twenty-five years. And in view of the character of the subject, we find no sound objection to its continuance. If Congress at any time undertakes to regulate such rates, its action will of course control." 234 U. S. at 332.

In a word, the bill as enacted was in quite a different form from the bill as originally introduced. As the bill came out of the Senate Committee on Interstate Commerce and as passed by the Senate it had this provision: "the term 'interstate commerce' means transportation . . . from a place in one State . . . to a place in another State . . . or between places in the same State by a route or routes passing beyond the borders of said State . . ." 84 Cong. Rec. 5964. This was not merely a choice of language but a choice of purpose. The Committee and the Senate, that is, asserted a control as extensive as that which Congress asserted in 1935 over motor carriers. The practical result of the purpose thus manifested was to exclude state control over water carriers from port to port in the same State but entering the water of a border State. The House evidently had other views, for that provision was deleted after the Senate bill was committed to the House Committee. That Committee reported and the House passed this restrictive provision: "The term 'interstate or foreign transportation' . . . means transportation of persons or property—(1) wholly by water from a place in a State to a place in any other State, whether or not such transportation takes place wholly in the United States." 84 Cong. Rec. 9956. The Senate receded from its formulation (H. Rep. No. 2016, 76th Cong., 3d Sess., p. 30), and the restrictive House provision became the law. But we are now told that this change from explicit assumption of jurisdiction is meaningless, and the fact that the provision in the Senate bill was left out as the bill went through the House, the Conference and to passage has precisely the same significance as though the original Senate provision had remained in it. As to this as well as other phases of water transportation, Congress circumscribed the Commission's authority and left state regulation to continue to operate as to matters

which, in the case of rail and motor transportation, federal control has been asserted. Thus for instance, use of the Shreveport doctrine (see *Houston, E. & W. T. Ry. Co.* v. *United States*, 234 U. S. 342)—the control over state rates discriminatory against interstate rates—is explicitly denied (§ 303 (k)), and numerous other exceptions and exemptions show "congressional intent to confer more limited jurisdiction than has been given in the other parts of the act." 250 I. C. C. 577, 586.

No doubt, as the House Committee said, "Most of the regulatory provisions included in the new part III were modeled on provisions of part I dealing with the same subject." H. R. No. 1217, 76th Cong., 1st Sess., p. 18. In its context, the idea behind the phrase "regulatory provisions" bears on how to regulate, not what is regulated. And the fact that "most" provisions were the same, not all, indicates that variations from Part I were made in Part III. When therefore we find differences in definition of the "commerce" to be regulated between Part I and Part III, it will not do to disregard them and find identity through variation. Particularly is this true when there are practical differences to account for the variation. We must first define the field of the regulation—what "commerce" between two points in the same State but going through another becomes federally regulated although theretofore free from state regulation as was rail transportation, and what "commerce" is given over to federal regulation although theretofore it was within the province of state regulation as was water transportation in a situation like that under discussion. We thus have the practical differences between water-borne and land traffic, the practical problems in the distribution between state and federal power raised by water-borne traffic on boundary streams, and the actual differences in the definitions of "commerce" in the same Act of Congress responding to

these differences of fact between water-borne and land transportation. All enjoin judicial regard for these differences in the construction of the statute.

The definition originally proposed in the Senate bill was intended to cover all three types of carrier—rail, water and motor. Particularization in this proposed definition of transportation within one State but through a second is clear proof that the *Hanley* doctrine applicable to rail carriers did not carry over to water and motor carriage. When Congress finally rejected the all-inclusive definition proposed by the Senate and decided on separate definitions of the commerce to be regulated, it did so precisely because it realized that the legal situation as to the three types was not the same. This careful process of distinctive definition by Congress is now in effect held to have been a futile legislative endeavor. The all-inclusive definition in the original Senate bill which the Congress rejected this Court restores.

A final word. We must not be unmindful that the Committees on Interstate Commerce out of which issued this legislation have a continuity of membership which makes them well versed in the problem before us: namely, how much of the constitutional power possessed by Congress for the control of utility services should in fact be committed to the Interstate Commerce Commission. (The Chairmen of the Senate and House Committees on Interstate Commerce, who had charge of the bills that became the Transportation Act of 1940, have been members of these Committees for twenty and twenty-three years respectively.) Particularly therefore when dealing with legislation coming from these Committees and in matters involving displacement of state by federal authority, we ought not to assume that Congress did not attach significance to what it said and meant to convey that which skilled language withheld. It is more respectful of Congress to attribute to it care instead of casualness. It is

certainly more consonant with judicial tradition and more conducive to legislative responsibility for courts to act on that belief.

I am therefore compelled to conclude that the Commission was not given power to regulate transportation by Cornell from one port in New York to another port in the same State.

MR. JUSTICE ROBERTS joins in this dissent.