## CALLANAN ROAD IMP. CO. v. UNITED STATES et al.
### Civ. No. 4273.

United States District Court
N. D. New York.

Argued Aug. 12, 1952.

Decided Sept. 15, 1952.

James E. Wilson, Washington, D. C. (Thomas W. Cantwell, Albany, N. Y., on the brief), for plaintiff.

William J. Hickey, Sp. Asst. to Atty. Gen. (Newell A. Clapp, Acting Asst. Atty. Gen., James E. Kilday, Sp. Asst. to Atty. Gen., and Edmund Port, U. S. Atty., Syracuse, N. Y., on the brief), for the United States.

H. Neil Garson, Atty., Interstate Commerce Commission, Washington, D. C. (Edward M. Reidy, Chief Counsel, Interstate Commerce Commission, Washington, D. C., on the brief), for Interstate Commerce Commission.

R. Granville Curry, Washington, D. C. (Curry & Dolan and Frederick M. Dolan, Washington, D. C., Thacher, Proffitt, Prizer & Crawley and Paul L. Clugston, all of New York City, and Reilly & Reilly and Desmond F. Reilly, all of Albany, N. Y., on the brief), for Cornell Steamboat Co.

Before CLARK, Circuit Judge, BRENNAN, Chief Judge, and FOLEY, District Judge.

CLARK, Circuit Judge.

This is an action in usual form and course, 28 U.S.C.A. §§ 1336, 1398, 2284, 2321–2325, 49 U.S.C.A. §§ 17(9), 916(a), to set aside and enjoin the enforcement of an order of the Interstate Commerce Commission which regulates the competition between certain common carriers by water on the Hudson River in New York and New Jersey. The plaintiff, holding the Commission's certificate of public convenience and necessity for "freighting," is endeavoring to extend this to include "towing," basing its contention on several points, of which the most far-reaching is the assertion of lack of power in the Commission to limit its certificate so as to exclude towing. Several competitors intervened before the Commission, but the brunt of the opposition was borne by the initial objector to plaintiff's activities, Cornell Steamboat Company. Cornell's opposition has continued to this action wherein it has been granted intervention and has been an active defendant. The Commission's decision has been against the plaintiff. We think the Commission was right.

Consideration of the case must start with the enactment in 1940 of Part III of the Interstate Commerce Act dealing with "Water Carriers," wherein no common carrier by water is permitted to engage in transportation under the Act unless it holds a certificate of public convenience and necessity issued by the Commission, but with "grandfather" rights, to be established by and before the Commission, to those in business on January 1, 1940. § 309(a), 49 U.S.C.A § 909(a). The Commission held Cornell's tugboats to be "water carriers" and Cornell itself a common carrier under Part III of the Act in decisions reported in 250 I.C.C. 301, 577, which were sustained on appeal to the courts. Cornell Steamboat Co. v. United States, 321 U.S. 634, 64 S.Ct. 768, 88 L.Ed. 978, affirming D.C.S.D.N.Y., 53 F.Supp. 349. The Commission did, however, grant Cornell a certificate of public covenience and necessity for towing, based on its grandfather rights, for it had been in the towage business on the Hudson River for 115 years. This certificate it still holds and on this basis it conducts its business.

The basis for plaintiff's asserted rights requires a more extensive statement. Plaintiff's predecessor in interest was one Joseph R. Hutton, who, during the crucial grandfather period prior to January 1, 1940, owned and managed one steam-power boat of about 240 horsepower, and four barges, all of which were operated as a unit. The power boat was used in towing the barges and constructed so as to carry also about 150 gross tons of freight. On occasions other barges were rented or chartered for operation in Hutton's fleet, and they transported items running all the way from wheat and wastepaper to pig and scrap iron and fertilizer from or to points in New York Harbor up the Hudson River and the State Barge Canal as far as the Niagara River. Hutton, having failed to secure complete exemption from the Commission, then sought a certificate based on grandfather rights; and this the Commission granted on July 17, 1942. Hutton Contract Carrier Application, 250 I.C.C. 804. In this report, Division 4 made definite findings, as just stated, of the extent of Hutton's prior operations—he had been in business for 37 years, and his ancestors had operated before him—and found that he was a common carrier, and not a contract carrier, "of commodities generally" between the points named. Its "Certificate and Order" incorporated this report as a part of itself and inter alia ordered that

the applicant be "authorized to continue operation as specified above, subject, however, to such terms, conditions, and limitations as are now, or may hereafter be, attached to the exercise of such authority by this Commission."

Meanwhile the Commission had had occasion to state the distinction between freightage and towage. Cornell Steamboat Co. Contract Carrier Application, supra, 250 I.C.C. 301, 304, 305; Eastern Transp. Co. Contract Carrier Application, 250 I.C. C. 505, 508. This was not a new idea; it went back to well-known differences in admiralty shown by the difference in liability of a tower and of a common carrier of freight. Stevens v. White City, 285 U.S. 195, 200, 52 S.Ct. 347, 76 L.Ed. 699. In these decisions in 1942 the Commission, while noting the distinction, did not require a distinct specification as to each in its certificates. That came in Campbell Transp. Co., Common Carrier Application, 260 I.C. C. 107, Dec. 14, 1943, wherein the Commission definitely established that "Towage is a distinct type of service or field of operation. Many carriers perform only towage, and others which were engaged in freighting by barges and towboats did not perform such towage service for shippers during the 'grandfather period.' Carriers whose certificates or permits do not specifically authorize the performance of towage are without authority to engage in such service."

On March 4, 1944, the Commission of its own motion ordered the Hutton application opened for reconsideration and filed a report and amended certificate and order. Hutton Contract Carrier Application, 260 I.C.C. 804. Herein Division 4 of the Commission pointed out that in its prior report it had not specified the "type of vessels" to be used by the applicant in the exercise of the authority granted, and that in the absence of any limits in the certificate, "applicant would be free to extend its operations and perform services different from those performed by him on and since the statutory date." Accordingly it modified the authority previously granted to the vessels then operated by the applicant, and again it recited the plaintiff's flotilla as

above set out and made findings accordingly. And the amended certificate and order certified, "That public convenience and necessity require the continuance of operation by applicant as a common carrier by water, by self-propelled vessels and by non-self-propelled vessels with the use of separate towing vessels in interstate or foreign commerce, in the transportation of commodities generally between points in the area" substantially as defined before, and ordered that the said carrier be "authorized to continue operation as specified above, subject, however, to such terms, conditions, and limitations as are now, or may hereafter be, attached to the exercise of such authority by this Commission." The previous certificate and order was superseded and cancelled.

Hutton accepted the new certificate apparently without any question and certainly without any formal objection, either within the time permitted or otherwise. He died in January, 1945, and his widow as administratrix sold and transferred his operating rights to the plaintiff for $2,750 by a transaction approved by the Commission's Division 4 on August 18, 1947. Hutton Certificate Transfer (not printed in full), 265 I.C.C. 813. Because an association of water carriers operating on the State Canal Systems protested and because plaintiff was not then operating in the Canal, the certificate transfer granted plaintiff only the right of operation on the Hudson from Waterford (the point of intersection with the Canal) to New York Harbor. As the report herein below, 285 I.C.C. 75, shows, the sale was consummated in September, 1947; and an amended certificate, limited to the Hudson, but otherwise authorizing the same operations as were permitted in the amended Hutton certificate, was issued to plaintiff on February 5, 1948. Plaintiff owns two towboats and charters others. It produces crushed stone at Kingston, N. Y., and transports it down the Hudson in its vessels for sale and delivery in the New York Harbor area. In the same tows it also operates as a carrier for hire in the movement of brick loaded on its own or chartered scows. As to these activities no question is raised; the issue arises as to

its movement also of scows of the shippers, for which it makes allowance in accordance with its tariff, I.C.C. No. 2, which it initiated in 1949 and which became effective April 17, 1949. The shippers' scows have a captain on board responsible to the shipper or scow owner and paid by him. The plaintiff also returns the empty scows, where required, and does not claim the right itself to fill them or use them on return.

On May 11, 1949, Cornell complained to the Commission that this tariff embodied rates which contemplated the service of mere towage in violation of the plaintiff's certificate. On September 19, 1950, a representative of the Commission notified plaintiff that the towage operations would be unlawful, citing Dixie Carriers, Inc., Rates and Allowances, 278 I.C.C. 417, wherein Division 2 of the Commission had reiterated the previous rulings of the Commission that towage was not permitted unless specifically authorized in the enabling certificate. On January 2, 1951, plaintiff filed a petition with the Commission for interpretation and formal disposition of the Cornell complaint. Cornell in its reply reiterated its position, and hearings and proceedings on a proposed report and exceptions thereto finally culminated in the report and order here under attack. The report by Division 4 concluded with the view "that the petitioner has been and is performing the service of towage without appropriate authority therefor under section 309 of the act, and that the rates, charges, and allowances in its tariff I.C.C. No. 2, to the extent that they cover such service as is herein found to be towage, are published without authority, and therefore are unlawful." And its order cancelled the rates, charges, and allowances described, and discontinued the proceeding. The report, 285 I.C.C. 75, has a complete statement of facts, to which we make reference and which we accept as our own. As a matter of fact there is substantially no conflict as to the basic facts; the issue arises as to the law applicable.

After this order plaintiff petitioned for reconsideration and Cornell replied. The petition was denied by the entire Commission on March 17, 1952, and this action followed on April 10, 1952. Plaintiff has also made other direct applications to the Commission for towage rights, all of which have been denied. These are not before us in this action.

Certain contentions, albeit vigorously urged by plaintiff, we believe can be shortly answered. Plaintiff says that it, too, is engaged in freighting, not towing, that in any event Hutton's initial certificate constituted authority to engage in the activity it now contemplates, and that the Commission lacks authority to revoke a certificate once permanently and definitively granted, citing United States v. Seatrain Lines, 329 U.S. 424, 67 S.Ct. 435, 91 L.Ed. 396. The first contention rests on concessions always made by the Commission, and stated, for example, in both the Campbell and Dixie cases, that a carrier engaged in a freighting service might employ the scows of others, including shippers, so long as it used them for its freighting purposes and did not merely transport them as service to the owners. But we agree with the Commission that the facts do not permit of such an interpretation of plaintiff's activities. The provision for return of shippers' scows light to points of origin, the inapplicability of plaintiff's ordinary rules for free time and demurrage when scows are furnished by shippers, the charge made for the return of the empty scow (or allowance in the tariff when it is not returned), the concession that plaintiff may not itself load such a scow at New York for an upstream movement in lieu of returning the vessel light to its owner at origin, the control of the scows by the shippers' own captains—all support the finding (and permit of no other) that shippers' scows are received by plaintiff as part of a consignment to be towed and are not used as a part of its equipment. In fact it is because of this operation and the rates and allowances it has made upon receiving shippers' scows laden with New York bound commodities that plaintiff has been able to undercut Cornell, causing—on its initial purchase of $2,750—a loss to Cornell asserted by the latter to have reached $250,000 of revenue in a single year.

■ So the claimed revocation is substantially different from that in the Seatrain case, an outright and unconsented-to limitation of a broad certificate, which we shall discuss more at length below. Even under the principle of that case it would seem that the Commission might act in any event to correct a certificate having the obvious legal ambiguity of the first Hutton certificate which, although in form general, was nevertheless expressly based on a finding of more limited grandfather rights. But we are clear that in any event this can be done where the carrier has consented or waived objection. Here Hutton raised no question; obviously he was getting all he claimed or wanted. Later, on the transfer, plaintiff raised no objection; in fact it accepted without question a superseding certificate which cut down its rights considerably, namely, on the point of territory covered. In the very report approving the transfer, the Commission answered the there protestant's objection based upon the Seatrain case by referring to this consent of the applicants. Plaintiff's present attempt to expand its grant is an obvious afterthought stimulated by the exigencies of its competition with Cornell. In fact its present position would seem a collateral attack upon its own certificate which was the Commission's ultimate and decisive act as to it. United States v. Rock Island Motor Transit Co., 340 U.S. 419, 448, 71 S.Ct. 382, 95 L.Ed. 391. But we prefer to place decision upon the broader ground of the Commission's power to make the classification it is now so extensively employing. To that issue we now turn.

Here the plaintiff's position is that the Commission's powers are limited to the grant of the certificate of convenience and necessity and that it lacks power to specify the type of service to be rendered by a carrier after it has been certificated. Here, too, its reliance is upon United States v. Seatrain Lines, supra. In that case the Commission, having granted Seatrain a certificate for the carriage of "commodities generally" to certain ports, was held not empowered to recall it and substitute a certificate limited to carrying liquid car-

goes in bulk, empty railroad cars, and property located in freight cars received from and delivered in railroad carriers, that is, the so-called "car-ferry service." But while there are some superficial resemblances, we think the differences between that case and this are substantial and decisive.

Seatrain had long been a common carrier of goods by water. It had developed a distinctive type of service for which its harbor facilities and vessels had been constructed, namely, that of ferrying freight cars in the form received from railroads. But, and this is important, it also carried commodities generally. So in 1941 it filed two applications, one for grandfather rights from New York to New Orleans, La., as it had operated since 1932 and one for new rights from New York to Texas City, Tex., on a route which it had begun to operate in 1940. In each case it described its operation as that of a "common carrier by water of commodities generally." After notice, hearing, and investigation, Division 4 of the Commission satisfied itself of Seatrain's rights thus to engage in transportation on both the routes as such a common carrier; and in 1942 a single certificate was duly issued authorizing Seatrain to carry "commodities generally between the ports of New York [N. Y.], New Orleans [La.], and Texas City [Tex.], by way of the Atlantic Ocean and the Gulf of Mexico." In 1944 the Commission, of its own motion, reopened the proceedings and against Seatrain's protest (carried eventually by direct action to the Supreme Court) cancelled the former certificate and issued the limited one noted above. The Supreme Court, affirming the decision below, Seatrain Lines v. United States, D.C. Del., 64 F.Supp. 156, held that this involved more than a correction and constituted a change of policy and that no such power of revocation was granted the Commission. Then it went on to consider the Commission's argument that "this proceeding does not effect a partial revocation of Seatrain's certificate, but is merely an exercise of the Commission's statutory power under § 309 (d) [49 U.S.C.A. § 909(d)] to fix 'terms, conditions, and limitations' for water carrier certificate holders." It said: "Wheth-

er the Commission could, under this authority, have imposed a restriction in an original certificate as to the type of service a water carrier could utilize to serve its shippers best is by no means free from doubt." Then it pointed out certain differences between the power over water carriers of § 309(d) and the corresponding power over motor carriers of § 208, 49 U.S.C.A. § 308, which—unlike the power here—expressly authorized the Commission to "specify the service to be rendered" by those carriers. Thus it held certain of its decisions as to the regulation of motor carriers "not controlling as to the Commission's power to regulate the details of the service of water carriers" and concluded, "We can find no authority for alteration of Seatrain's certificate from the Commission's power to fix 'terms and conditions.'" United States v. Seatrain Lines, supra, 329 U.S. at pages 431, 432, 67 S.Ct. at page 439.

Certain differences in the legal situation and the equities are at once obvious. Here the early reopening was to clarify the grandfather rights sought and granted, and the correction was accepted. What we are dealing with is a later attempt to expand those rights beyond anything covered or contemplated by the grandfather privilege. There Seatrain fought throughout to preserve rights it had definitely exercised, some throughout the grandfather period in fact, and rights which the Commission had recognized with finality before it sought, after an interval, to take them away. In fact, Judge Biggs for the court below, D.C.Del., 64 F.Supp. 156, relied as an additional ground for reversal on the expenditures and large commitments made by Seatrain in reliance upon the original certificate, a point not reached by the Supreme Court. But we shall pass all this, for we think the Commission had the power to make the classification in question distinguishing between freighting and towing service, and that this was not a regulation of "the details of service," but a "just and reasonable classification of groups of carriers included in the terms 'common carrier by water,' or 'contract carrier by water,' as the special nature of the services performed by such carriers shall require"

which the Commission is expressly authorized to establish. § 304(c), 49 U.S.C.A. § 904(c).

The Commission's reasons for its classification are stated not only in its decisions we have cited above, but also in others of long standing. Thus in A. L. Mechling Barge Line Common Carrier Application, 250 I.C.C. 77, Division 4 limited the applicant's service to transportation by barge, that being the type it had furnished, and said: "Classification of carriers in terms of their type of operation assures the public that the same type of service will be continued by them. In this manner the competitive balance of types of carriers over the same route will not be disrupted by changes which they might make without first securing from this Commission the necessary certificates of public convenience and necessity. We will, therefore, as a general policy employ such a classification in defining the operating rights of water carriers subject to Part III of the act." And the necessity of such classification to execute the Congressional intent to preserve grandfather rights and prevent the expansion of monopoly to upset the balance existing up to 1940 is stressed in detail in cases such as Erie & St. Lawrence Corp. Contract Carrier Application, 260 I.C.C. 235, 238, and Norfolk, Baltimore and Carolina Line, Inc., Ext.—James R., 265 I.C.C. 247, 253, 254, affirmed on this point by the entire Commission, 265 I.C.C. 313. Other cases, too numerous to mention, have been cited to us where the Commission has acted either to grant both freighting and towing rights by careful and specific mention of each or by specific grant of operation in the performance of towage alone. And the Supreme Court has sustained such certificates, albeit without discussion of this specific point. See Warner v. United States, 341 U.S. 907, 71 S.Ct. 623, 95 L.Ed. 1345, affirming on motion, D.C.W.D.Tenn., 97 F. Supp. 580, referring to this specification on p. 582, which sustained 265 I.C.C. 543; United States v. Detroit & Cleveland Nav. Co., 326 U.S. 236, 66 S.Ct. 75, 90 L.Ed. 38, sustaining the certificate in 260 I.C.C. 175.

In making these classifications the Commission has relied not only on § 304(c)

quoted in crucial part above, but also on § 309, dealing with the issue of certificates of public convenience and necessity. Thus subd. (c) of § 309 provides that the Commission shall issue a certificate "to any qualified applicant therefor, authorizing the whole or any part of the operations covered by the application, if the Commission finds that the applicant is fit [etc.], * * * and that the proposed service, to the extent authorized by the certificate, is or will be required by the present or future public convenience and necessity." And subd. (d), requiring the certificate to specify routes, also provides that "there shall be attached to the exercise of the privileges granted by such certificate such reasonable terms, conditions, and limitations as the public convenience and necessity may from time to time require, including terms, conditions, and limitations as to the extension of the route or routes of the carrier, and such other terms, and conditions, and limitations as are necessary to carry out, with respect to the operations of the carrier, the requirements of this chapter or those established by the Commission pursuant thereto: Provided, however, That no terms, conditions, or limitations shall restrict the right of the carrier to add to its equipment, facilities, or service within the scope of such certificate, as the development of the business and the demands of the public shall require, or the right of the carrier to extend its services over uncompleted portions of waterway projects now or hereafter authorized by Congress, over the completed portions of which it already operates, as soon as such uncompleted portions are open for navigation."

Plaintiff stresses the reliance of the Court in the Seatrain case on the proviso as preventing the limitation of facilities and service. But we agree with the Commission that this points up the difference between the two cases and affords a final ground of distinction between "service" as there considered and defined, and scope of operations as here provided. The proviso prevents forbidding new and better equipment and facilities to carry out the operations "within the scope of such certificate"; it does not authorize an expansion of operations beyond the grandfather rights set out in subd. (a) of this section or the classification authorized by § 304 (c). We agree with the Commission that it cannot carry out the purpose and intent of Part III if such indefinite expansion as contemplated by the plaintiff is allowable against the Commission's finding of a public interest to the contrary. Specifically there will be set at naught the intent of the grandfather clause, as defined by the Court in the provisions as to motor-carriers. Crescent Express Lines v. United States, 320 U.S. 401, 64 S.Ct. 167, 88 L.Ed. 127; Noble v. United States, 319 U.S. 88, 63 S. Ct. 950, 87 L.Ed. 1277. Even though these cases may not be complete precedents for the reasons stated in the Seatrain case, yet they do state the use of the grandfather clause to preserve "the position which the carrier had obtained in the nation's transportation system." Noble v. United States, supra, 319 U.S. at page 92, 63 S.Ct. at page 952. Here Cornell and Hutton had operated without friction apparently for generations in their respective spheres on the Hudson; it would be indeed ironical if under cover of an act designed to preserve that parity, plaintiff was enabled to upset it quite completely.

We agree, therefore, with the Commission's assertion of power to make the classification in question. We should add that had we been in more doubt we should have nevertheless felt in some compunction to yield to the Commission's informed judgment and settled rulings on a matter so much within its competence. United States v. Detroit & Cleveland Nav. Co., supra; Alton R. Co. v. United States, 315 U.S. 15, 62 S.Ct. 432, 86 L.Ed. 586; United States v. Pierce Auto Freight Lines, 327 U.S. 515, 535, 536, 66 S.Ct. 687, 90 L.Ed. 821.

Decision of this basic issue settles the case. Plaintiff attempts to rely further on the provisions of § 314, 49 U.S.C.A. § 914, authorizing a carrier to make allowances in its tariffs for services rendered by a shipper in connection with the transportation furnished, and so separately supports the allowances made in its tariff for the shipper's scows. But obviously this deals with lawful transportation; it does not

override earlier sections to make that lawful which is unlawful. The Commission was not overstepping its powers under this section to pass upon the reasonableness of the allowances; it never got to that question in making its decision that the entire operation was illegal. Emery Transp. Co. v. United States, D.C.S.D.Ohio, 91 F.Supp. 644, 646, affirmed 339 U.S 955, 70 S.Ct. 982, 94 L.Ed. 1367.

Plaintiff raises two further points which seem not to have been raised, or in any event pressed, below. The first is that the Commission's statement of findings, conclusions, and ruling are somehow inadequate under the terms of § 8(b) of the Administrative Procedure Act, 5 U.S.C.A. § 1007(b). This objection seems to border on the frivolous, particularly as it is entirely general, without any indication how the plaintiff has been harmed or about what it is left in doubt. Whatever the reach of the A. P. Act, we think the findings entirely adequate and complete, indeed praiseworthily so. The other is the claim that the Commission lacks jurisdiction because the transportation in question was in intrastate commerce. But this claim was specifically set at rest in Cornell Steamboat Co. v. United States, supra. The New Jersey state line starts at the middle of the Hudson River from a point north of Yonkers down past New York City, and the transportation is in interstate commerce.

Accordingly the defendants must have judgment. The clerk is directed to enter judgment for the defendants, dismissing the action on the merits, immediately on the filing of this opinion.