UNITED STATES of America, Plaintiff,

v.

Carl YAQUINTA, Philip Joseph Hankish, Howard Oscar Allen, Albert Downing, Nick Vukovich, and Louis Gresko, Defendants.

No. 7340.

United States District Court
N. D. West Virginia,
at Wheeling.

May 1, 1962.

Robert E. Maxwell, U. S. Atty., John H. Kamlowsky, Asst. U. S. Atty., John P. Diuguid, Sp. Counsel, Department of Justice, for plaintiff.

Gilbert S. Bachmann, Wheeling, W. Va., for defendants Vukovich and Gresko.

Arch W. Riley, Riley & Riley, James A. Byrum, Wheeling, W. Va., for defendants Yaquinta, Hankish, Allen and Downing.

CHARLES F. PAUL, District Judge.

Count One of the indictment charges all six defendants with conspiracy to violate Title 18, United States Code § 1084. Counts Two and Three of the indictment charge all of the defendants, as principals and accessories, with the substantive offenses of violating said § 1084 on December 4, 1961, and December 6, 1961, respectively. All defendants have moved to dismiss the indictment with respect to the charged offenses.

Language contained in the indictment, supplemented by the bills of particulars filed by the Government, reveals the following claimed state of facts:

The defendants Allen and Downing conducted a book-making shop for off-track wagering on horse races, in Wheeling, West Virginia. The defendants Vukovich and Gresko conducted a similar and related book-making shop in Weirton, West Virginia. Part of the business of the two shops was taking bets and wagers on the results of horse races run at Waterford Park, near Chester, West Virginia. The defendant Hankish attended the races at the track, and, by means of a portable radio transmitter or walkie-talkie, broadcast the results of the races. The defendant Yaquinta was stationed in a housetrailer at Arroyo, West Virginia, a short distance from the track, where he received the information broadcast by Hankish on a radio receiving set. Immediately after reception of the information, Yaquinta relayed the information, by long-distance telephone, to the bookie shops in Weirton and Wheeling. To the knowledge of all defendants, the lines of the Telephone Company crossed the river, which is the border between West Virginia and Ohio, to the East Liverpool, Ohio, exchange of the Telephone Company. On the calls, the connection with the receiving ends was made by the operator at East Liverpool, through circuits connecting with Weirton and Wheeling.

The pertinent portions of § 1084, which was enacted September 13, 1961, are as follows:

"(a) Whoever being engaged in the business of betting or wagering knowingly uses a wire communication facility for the transmission in interstate * * * commerce of * * * information assisting in the placing of bets or wagers on any sporting event * * *, shall be fined not more than $10,000 or imprisoned not more than two years, or both."

The defendants contend that the congressional intent expressed in the statute was not to make criminal the use of an interstate wire transmission facility to carry messages emanating from a point in West Virginia to receiving points, also in West Virginia, no matter how many other States the electrical impulses, carried by the wires, traversed.

Parimutuel betting at licensed race tracks, of which Waterford Park is one, is legal in West Virginia; off-track betting is not. The statute, as far as is known, has not yet been construed. The "purpose" of the statute is succinctly stated in Report No. 588 of the Senate Judiciary Committee of the 87th Congress, on July 24, 1961, as " * * * to assist the several States in the enforcement of their laws pertaining to gambling and to aid in the suppression of organized gambling activities by restricting the use of wire communication facilities." Both in oral argument and on brief, defendants' counsel have stated that "unquestionably Congress has the power to regulate all traffic in interstate commerce, and in recent years has shown little hesitancy to exercise such power. Thus, defendants concede that Congress could, if it wished, enact legislation sufficiently broad to cover the facts of the instant case. The question is whether § 1084 is so designed." The problem then is that often encountered but still

esoteric one of "discovering" the congressional intent.

Counsel have endeavored to be helpful by drawing analogies between the question presented by § 1084 and other Acts of Congress in cases both criminal and civil, where transportation, travel or transmission between two points in the same State crossed, enroute, the borders of another State, including the following:

(1) The provisions of Title 18 § 1951, in which, in sub-section (b) (3), the Hobbs Act defines commerce, for the purposes of the anti-racketeering objectives of the Act, to include "all commerce between points within the same State through any place outside such State * * *."

(2) United States v. Winkler, W.D. Tex.1924, 299 F. 832 (interstate transportation of stolen vehicle).

(3) United States v. Erie R. Co., N.J. 1909, 166 F. 352 (penalties of the Safety Appliance Act).

(4) Western Union Telegraph Co. v. Speight, 254 U.S. 17, 41 S.Ct. 11, 65 L.Ed. 104 (telegram from point to point in the same State, passing through another). To the same effect a long list of decisions of State courts under The Communications Act (Title 47 U.S.C.A.) are cited, beginning with Western Union Telegraph Co. v. Mahone, 1917, 120 Va. 422, 91 S.E. 157.[1]

(5) Cornell Steamboat Co. v. United States, 1944, 321 U.S. 634, 64 S.Ct. 768, 88 L.Ed. 978 (water transportation between points in a single State, passing through territorial waters of another).

(6) Yohn v. United States, 2 Cir., 1922, 280 F. 511 (theft from interstate railroad shipment).

(7) Michael v. United States, 7 Cir., 1925, 7 F.2d 865 (rail shipment).

(8) United States v. Delaware Lackawanna R. Co., S.D.N.Y.1907, 152 F. 269 (rebates on rail shipments).

Although § 1084 does not attempt federal preemption of the crime of gambling, some analogies can be drawn from the following cases which deny State jurisdiction where the State lines have been crossed: Roundtree v. Terrell, N.D.Tex. 1938, 22 F.Supp. 297; Central Greyhound Lines v. Mealey, 1948, 334 U.S. 653, 68 S.Ct. 1260, 92 L.Ed. 1633; Missouri Pacific R. R. Co. v. Stroud, 1925, 267 U.S. 404, 45 S.Ct. 243, 69 L.Ed. 683.

As against the above cases, defense counsel have cited United States v. Wilson, D.C.Tenn.1920, 266 F. 712. This case involved a Mann Act charge in which the transportation was from Nashville to another point in Tennessee, on a train which passed through a portion of the State of Alabama. The District Court sustained a motion to dismiss the indictment, pointing out that the Act defined interstate commerce by the words "shall 'include transportation from any State or Territory * * * to any other State or Territory.' " and held that that definition did not fit the charge in the indictment. No such restrictive definition applies to § 1084.

While the cases, construing different statutes and under differing circumstances, are not particularly helpful, they do make it abundantly clear that the intermediate crossing of a State line provides enough of a peg of interstate commerce to serve as a resting place for the congressional hat, if that will serve the congressional purpose. The congres-

---

1. These cases, while civil in nature, have some pertinency because they make use of the definition of "wire communication" or "communication by wire", as contained in § 153 of Title 47, U.S.C.A.—The Communications Act. In referring to the amendment of § 1081 of Title 18, defining "wire communication facility", as used in § 1084, Report No. 967 of the House Judiciary Committee of the 87th Congress, dated August 17, 1961, in the "Sectional Analysis", is as follows:

"The first section of the bill amends § 1081 of Title 18, United States Code, by adding to that section of the chapter on gambling a new definition. The definition is that of 'wire communication facility', and as defined, is similar to the definition of 'wire communication' or 'communication by wire', as defined in § 153 of Title 47, United States Code [47 U.S. C.A. § 153]—The Communications Act."

sional purpose here is very frankly elucidated in the Attorney General's letter to the branches of the Congress, dated April 6, 1961, in which he says,

> "The purpose of this legislation is to assist the various States * * * in the enforcement of their laws pertaining to gambling, bookmaking, and like offenses and to aid in the suppression of organized gambling activities by prohibiting the use of * * * wire communication facilities which are or will be used for the transmission of certain gambling information in interstate * * * commerce. * * *"

> "Modern bookmaking depends in large measure on the rapid transmission of gambling information by wire communication facilities. For example, at present the immediate receipt of information as to the results of a horserace permits a bettor to place a wager on a succeeding race."

Both the congressional committees which reported this legislation favorably and the Attorney General's office which sponsored it have made it abundantly clear that the evil under attack is illegal gambling, and that the legislative purpose is to assist the States in the enforcement of their laws. The use of the commerce clause is the occasion rather than the reason for invoking federal jurisdiction. West Virginia needs just as much help in the enforcement of its anti-gambling statutes when the information which assists their violation comes from another point in West Virginia, as it does when that information comes from an adjoining or distant State. Admittedly, the federal government is without power to render such assistance unless an instrumentality of interstate commerce is employed, but, also admittedly, it has the power when such an instrumentality is employed. I find no evidence of the spirit of abnegation on the part of the Congress in the legislative history surrounding this enactment. The defendants urge that the evil attacked is "multi-state" organizational and profes-

sional gambling, but I cannot read into the Act a limitation which would so restrict its effect.

Defendants' counsel call attention to the following paragraph in the House Judiciary Report, explaining the exemption in sub-section (b) with regard to the transmission of gambling information from a State where the placing of bets and wagers on a sport is legal, to a State where betting (such as off-track betting) on the event is legal:

> "For example, in New York State parimutuel betting at a racetrack is authorized by State law. Only in Nevada is it lawful to make and accept bets on the race held in the State of New York where parimutuel betting at a racetrack is authorized by law. Therefore, the exemption will permit the transmission of information assisting in the placing of bets and wagers from New York to Nevada. On the other hand, it is unlawful to make and accept bets in New York State on a race being run in Nevada. Therefore, the transmission of information assisting in the placing of bets and wagers from Nevada to New York would be contrary to the provisions of the bill."

Defendants' counsel argue that since, in the transmission of the messages from New York to Nevada, the transmission lines traverse many States where off-track betting is illegal, and must pass through telephone exchanges in those States, the framers of the Act did not intend to make the incident of the locations of the telephone exchanges of legal significance. The argument loses sight of the fact that the objective of the Act is not to assist in enforcing the laws of the States through which the electrical impulses traversing the telephone wires pass, but the laws of the State where the communication is received. To mix a metaphor, the telephone wire may seem a slender thread on which to hang the federal crime, but it is a substantial part of the web in which these defendants seem to be caught.

The motions to dismiss are denied.