## DE BARDELEBEN COAL CORPORATION et al. v. UNITED STATES et al.

### Civ. No. 2667.

District Court, W. D. Pennsylvania.

March 17, 1944.

644

Clyde A. Armstrong, of Pittsburgh, Pa., for plaintiffs.

Charles F. Uhl, U. S. Atty., of Pittsburgh, Pa., and J. Stanley Payne, Asst. Chief Counsel, Interstate Commerce Commission, of Washington, D. C., for defendants.

Before BIGGS and JONES, Circuit Judges, and McVICAR, District Judge.

JONES, Circuit Judge.

This suit was brought by the plaintiffs (hereinafter referred to as the "Coyle Lines") under appropriate provisions of the Judicial Code, 28 U.S.C.A. § 41(28) and §§ 43–48, inc., to enjoin and set aside an order of the Interstate Commerce Commission in so far as the certificate of public convenience and necessity thereby granted to Union Barge Line Corporation (hereinafter referred to as "Union") permits the latter to operate as a common carrier by water on the Gulf Intercoastal Waterway (hereinafter referred to as "Waterway"). Answers to the plaintiffs' complaint were filed by the United States, by the Interstate Commerce Commission, and by Union, as an intervening defendant. The matter was heard on the pleadings by a three-judge court.

The certificate in question was granted by the Commission under Sec. 309(a) of Part III of the Interstate Commerce Act, which provision was added to that Act by the Transportation Act of September 18, 1940, 54 Stat. 898, 929, 49 U.S.C.A. §§ 901–923, for the purpose of subjecting common carriers by water to more comprehensive regulation by the Commission.

As in the case of Parts I, II and IV of the Interstate Commerce Act, 49 U.S.C.A. §§ 1 et seq., 301 et seq., and 1001 et seq., which have to do with the regulation of other transportational types of common carriers, Sec. 309(a) of Part III provides that no common carrier by water shall engage in interstate or foreign transportation within the purview of that chapter unless such carrier holds a certificate of public convenience and necessity issued by the Commission. The section also provides, by a so-called "grandfather" clause, that, if any common carrier by water was in bona fide operation on January 1, 1940, over the route or routes or between the ports with respect to which application for a certificate is made and has so operated since that time, the Commission shall

issue a certificate without requiring further proof that public convenience and necessity will be served by the carrier's operation.

Part III became effective upon its enactment. Within the time therein limited for the purpose, Union made application under the "grandfather" clause for a certificate permitting its operation as a common carrier on the Ohio, Mississippi and other tributary rivers and on the Gulf Intercoastal Waterway west of New Orleans and south of Placquemine, Louisiana. The Waterway now extends along the Gulf coast from a point near Apalachicola, Florida, through New Orleans, Louisiana, and Galveston, Texas, to Corpus Christi, Texas. There is an additional connecting link between the Waterway and the Mississippi River which extends southwardly from the Mississippi at Placquemine, Louisiana (north of New Orleans), to Morgan City, Louisiana, on the Waterway west of New Orleans. Thus New Orleans may be bypassed by vessels going to and from the Mississippi north of New Orleans and the Waterway west of that city. At Galveston, Texas, the Houston Ship Canal provides an extension from Galveston to Houston and is a part of the Waterway.

At the hearing on Union's application for a certificate the Coyle Lines appeared and opposed the granting of so much of the application as related to Union's operations on the Waterway. The Commission's Examiner made a proposed report to which exceptions were filed, and after oral argument thereon a division of the Commission issued a report (250 I.C.C. 249) granting Union a certificate covering operations on the Ohio, Kanawha and Wolf Rivers and on the Mississippi River south of Cairo, Illinois, but denying authority to Union to operate on the Waterway. The report also dealt with two other applications by Union which are not involved in the present suit.

Upon Union's petition, the full Commission granted a reargument and, in a report thereafter filed (250 I.C.C. 689), reversed the conclusion of the division regarding Union's operation on the Waterway and enlarged the certificate to Union so as to include authority for its operation thereon in connection with and in furtherance of its river transportation. The Commission also enlarged the certificate to Union by authorizing its operation as a common carrier on the Mississippi River north of Cairo, Illinois, as far as St. Louis, Missouri. This latter enlargement is not challenged.

In the complaint filed in the present suit, the Coyle Lines, a common carrier on the Waterway, alleges that the Commission erred in granting authority to Union to operate on the Waterway, as a common carrier, on the ground that the traffic carried for Union on the Waterway, prior to the critical "grandfather" date, was not transported by Union but was delivered by it to the Coyle Lines at New Orleans and was transported by the latter, as the connecting carrier, on the Waterway westwardly beyond New Orleans. Coyle Lines further contends that, in any event, the certificate to Union is erroneous in so far as it authorizes Union's operations on the Waterway west of Galveston, Texas. We understood the plaintiffs at bar to abandon the latter contention. Whether or not it was then abandoned, we think it is so plainly without merit that we shall immediately dispose of it in passing.

At the critical date fixed by the Act for determining whether an applicant is entitled to claim the benefits of the "grandfather" clause, the Waterway was completed only as far as Galveston and Houston, Texas. Consequently in granting authority to Union to operate as a common carrier to the end of the now completed westward construction of the Waterway, viz., from Galveston to Corpus Christi, Texas, the Commission did no more than give appropriate effect to the provisions of Sec. 309(d) of the Act, which provides:

"That no terms, conditions, or limitations shall restrict * * * the right of the carrier to extend its services over uncompleted portions of waterway projects now or hereafter authorized by Congress, over the completed portions of which it already operates, as soon as such uncompleted portions are open for navigation."

The extension of the Waterway from Galveston to Corpus Christi was a waterway project authorized by Congress so that if Union (or any other carrier for that matter) operated over the completed portion of the Waterway to Galveston and Houston existing on the critical date of the "grandfather" clause, it would have the right under the provision above quoted to operate over the extension of the Waterway as soon as it was open for navigation. The important question is as to Union's

operation on the Waterway to Galveston on January 1, 1940, and its continuance of such operation thereafter.

The Commission found that Union "was in bona fide operation in interstate commerce on January 1, 1940, as a common carrier by water of commodities [in general] by means of non-self-propelled vessels with the use of separate towing vessels, between points on the Gulf Intercoastal Waterway south and west of New Orleans and Placquemine, La., * * * [and] that such operation has been continued since that date; * * *." From these findings the Commission concluded that Union "is entitled to a certificate of public convenience and necessity, authorizing continuation of such operation, * * *." If the findings above referred to were competently made, it can hardly be questioned that the conclusion which the Commission drew as to Union's right to a certificate correctly followed as a matter of law.

██ Our inquiry, therefore, is whether the findings set forth above are supported by substantial evidence. If they are, then they are final and binding here. Keller v. Potomac Electric Power Co., 261 U.S. 428, 441, 442, 43 S.Ct. 445, 67 L.Ed. 731; Interstate Commerce Commission v. Union Pacific R. R. Co., 222 U.S. 541, 547, 32 S.Ct. 108, 56 L.Ed. 308; Interstate Commerce Commission v. Delaware, L. & W. R. R. Co., 220 U.S. 235, 251–252, 31 S.Ct. 392, 55 L.Ed. 448. The basic facts are really not in dispute. The plaintiffs' complaint goes to the conclusion which the Commission drew from the undisputed facts.

It is the plaintiffs' contention that the Commission erroneously concluded that the service which the Coyle Lines performed for Union under contract in the matter of the movement of Union's barges on the Waterway was towage in connection with transportation by Union as the carrier and that the Commission so erroneously concluded by overextending the intended effect of Sec. 303(f) (2) of the Act with respect to how towage is to be treated.

The facts indisputably show that, on January 1, 1940, and prior thereto, Union initiated the water transportation of freight for shippers on the Ohio and Mississippi Rivers and certain of their tributaries for delivery to points on the Waterway south of Placquemine and west of New Orleans; that Union issued the bills of lading to the

shippers of such freight covering the transportation thereof from point of origin on the rivers to destination on the Waterway at established through rates and collected from the shippers the freight charges for the entire transportation; that Union took out insurance on the cargoes while in transit from point of shipment to destination; that all negotiations concerning such shipments were conducted by Union with the shippers, with whom Coyle Lines had no dealings whatsoever and to whom Coyle Lines was unknown; that the freight was loaded at the point of shipment in barges of Union and was so transported to destination; that the loaded barges were propelled on the Mississippi and other rivers by towboats of Union; and that the barges were towed on the Waterway by Coyle Lines under a contract between it and Union.

Under the contract Coyle Lines moved the laden and empty barges of Union on the Waterway at specified charges for the service which Coyle Lines named without reference to Union's charges to the shippers for the through transportation. No part of the revenues received by Union for such transportation service was ever prorated with Coyle Lines. Nor did the latter ever issue anything in the way of bills of lading to either Union or the shippers. The contract with Union was the only instrument to which Coyle Lines was a party. The service thus contracted for related to the movement of Union's barges in commerce without identification of the freight contained in them or the shippers thereof.

The contract expressly provided that in the movement of the barges on the Waterway neither the Coyle Lines nor its boats nor servants should be held, in any way, to common carrier liability; it also provided that the movement of the barges was to be at the sole risk of Union, and that the masters, crews and employees of the (Coyle Lines) towboats engaged in the service should become, be and remain the servants of the tow (i. e., Union) regardless of whether the tow assisted in the services in any way and irrespective of whether such persons were aboard the tow. Acceptance of the service by Union was expressly made to constitute acceptance of the terms and conditions just referred to.

██ Under these facts the Commission found that the service performed by Coyle Lines for Union on the Waterway was that of a tower and not a carrier.

We think the conclusion is amply justified by the evidence. The most that can be said for the plaintiff's contention that Union did not hold itself out to the general public as engaged in transportation as a common carrier over the Waterway is that there was some evidence affording an implication to that effect. But the Commission, after a careful review of all the evidence, both oral and documentary, resolved the fact in such regard contrary to the plaintiffs' contention. As there is substantial evidence to support that finding, it is binding upon us on review. Louisville & Nashville R. R. Co. v. United States, 245 U.S. 463, 466, 38 S.Ct. 141, 62 L.Ed. 400; United States v. Louisville & Nashville R. R. Co., 235 U.S. 314, 320, 321, 35 S.Ct. 113, 59 L.Ed. 245. In the end, whether Union held itself out as the through transporter of shipments to ports on the Waterway, at most, had no more than argumentative bearing upon the interpretation to be given the services which Union afforded shippers and which Coyle Lines actually performed in connection with the movement of Union's barges on the Waterway. The conclusion to be drawn from the contract between Union and Coyle Lines and the actions of the parties thereunder were peculiarly matters for the Commission's consideration. Nor does the fact that there was an element of law involved, because of the contract between Union and Coyle Lines, in ascertaining their true relationship to the Waterway towage serve to make the matter any less one for the Commission's ultimate determination. Illinois Central R. Co. v. Interstate Commerce Commission, 206 U.S. 441, 466, 27 S.Ct. 700, 51 L.Ed. 1128. See also United States v. Erie R. Co., 280 U.S. 98, 102, 50 S.Ct. 51, 74 L.Ed. 187, and Interstate Commerce Commission v. Delaware, L. & W. R. R. Co., loc. cit., supra.

The Coyle Lines contends that, notwithstanding its contractual freedom from liability to Union's shippers, it was none the less a common carrier in such connection, and cites State of Washington ex rel. Stimson Lumber Company v. Kuykendall, 275 U.S. 207, 48 S.Ct. 41, 42, 72 L.Ed. 241, where the Supreme Court, quoting from an earlier case, Liverpool & G. W. Steam Co. v. Phenix Ins. Co., 129 U.S. 397, 440, 9 S. Ct. 469, 471, 32 L.Ed. 788, said that,—"a common carrier is such by virtue of his occupation, not by virtue of the responsibilities under which he rests." Incidental-

ly, that was not said in connection with a determination as to what constitutes a tower under Part III of the Interstate Commerce Act. But, conceding that the plaintiffs' non-liability to the shippers of the freight in Union's barges was of itself insufficient to preclude them from being a connecting carrier, still we do not think that the fact of their own specified exclusion from common carrier liability was bereft of all evidentiary value when the Commission came to consider what the status of the Coyle Lines was in the particular under consideration. The fact that the Coyle Lines expressly relieved itself by its contract with Union from common carrier liability can hardly be thought of as establishing affirmatively that it was therefore a common carrier.

Sec. 303(f) (2) of Part III of the Interstate Commerce Act provides that:

"(f) Notwithstanding any provision of this section or of section 302, the provisions of this part shall not apply—

\*    \*    \*    \*    \*

"(2) *to transportation by water by any person* (whether as agent or under a contractual arrangement) *for* a common carrier by railroad subject to part I, an express company subject to part I, a motor carrier subject to part II, or *a water carrier subject to this part,* in the performance within terminal areas of transfer, collection, or delivery services, or *in the performance of* floatage, car ferry, lighterage, or *towage; but such transportation shall be considered to be performed by such carrier* or express company as part of, *and shall be regulated in the same manner as, the transportation by* railroad, express, motor vehicle, or *water to which such services are incidental."* (Emphasis supplied.)

Admittedly, Union, as a carrier by water on the Ohio, Mississippi and tributary rivers is subject to regulation under Part III of the Act. The division of the Commission to which this application was assigned for hearing expressly so found and that conclusion stands undisputed. The full Commission, upon reargument of the matter, finding that the service of the Coyle Lines in respect of the movement of Union's barges on the Waterway, was that of a tower and not a connecting carrier, accordingly held, under Sec. 303(f) (2), that the service performed by the Coyle Lines in such connection was incidental towage for Union subject to regulation as a part of the trans-

portation undertaken by Union as the carrier.

■■ The plaintiffs argue that the towage contemplated by Sec. 303(f) (2) is towage within terminal areas. Such a construction disregards the plain words of the statute. It is true that the provision does exempt from regulation transfers, collections or delivery services within terminal areas, but it also exempts the "transportation by water by any person * * * in the performance of floatage, car ferry, lighterage, or towage" without reference to the areas where such services are performed. That the exempted towage may be line-haul, as distinguished from terminal, has been recognized by the same division of the Commission in connection with other application proceedings. See Wood Towing Corporation Applications, 250 I.C.C. 170, where the towage was of laden and empty barges between Trenton, New Jersey, and Charleston, South Carolina. The crucial thing is that the particular service performed for a carrier subject to the Act is towage rather than the length of the towage. Carroll Towing Co. Application, 250 I.C.C. 417. To the extent that the tower performs such service for another carrier, the tower needs no certificate. See Goss Corporation Application, 250 I.C.C. 101. Such towage is a part of the carrier's transportation and is regulated as such. Sec. 303(f) (2).

While there should be no need, in the light of the plain words of the statute, to resort to legislative history for indication of intent, we think the legislative history of Part III fully confirms that Sec. 303(f) (2) was intended to exempt from regulation a tower's line-haul towage as well as its towage within terminal areas. The bill was originally introduced in the Senate (84 Cong.Rec. 3509) and after passage there (id. 6158) was referred to the appropriate House Committee, which recommended a substitute (H.Rept. 1217, 76th Cong., 1st Sess.). As reported to the House, the bill contained a provision exempting from regulation certain services, including only towage within terminal areas. But the bill was amended on the floor of the House to include also towage generally and, as so amended, was finally passed by both Houses in the form in which it now appears in Part III of the Act.

See Conference Report, H.Rept. 2832, 76th Cong. 3rd Sess., p. 8283.

■ The plaintiffs argue further that as Sec. 303(f) (2) is an exemptive provision, it can have no substantive bearing upon the question whether Union qualified for "grandfather" rights on the Waterway in connection with its shipments from the rivers. So much may be conceded and, yet, the provision does recognize and confirm that, where towage by a water carrier is performed for another carrier in the furtherance of the latter's interstate transportation, such towage is but incidental to the carrier's transportation and is subject to regulation as a part thereof. In short, Coyle Lines was not subject to regulation in respect of the towage which it performed for Union, but Union was, the towage being but an incidental part of the carrier's through transportation. Had the Commission adopted the contention of the Coyle Lines in respect of the service which the latter performed for Union, then line-haul towage, under the facts of the instant case, would not be subject to regulation at all. That would necessarily follow from the exclusory provision in Sec. 303(f) (2). Yet, regulation of interstate water transportation was the purpose of Part III.

■ The Coyle Lines does in fact hold a certificate as a carrier on the Waterway throughout its length, but that does not change the incidental character of the towage which it performed for Union on the Waterway in respect of cargoes initiated by Union on the rivers for delivery to points on the Waterway. Nor does the certificate of the Coyle Lines as a carrier on the Waterway operate to give it exclusive rights in the use of the Waterway. Sec. 309(e) of Part III. On the other hand, the certificate to Union does not give it common carrier rights on the Waterway with respect to shipments of freight originating and terminating thereon. Union's "grandfather" rights grow out of its through transportation of its river traffic to and from points on the Waterway, and the certificate awarded by the Commission is specifically so limited.

As we are of the opinion that the facts found by the Commission are supported by substantial evidence and, as so found, furnish legal warrant under the statute for the action taken by the Commission, the plaintiffs' complaint must be dismissed.