**PORT ROYAL MARINE CORPO-
RATION, Plaintiff,**

and

**Central Gulf Lines, Inc., et al.,
Intervening Plaintiffs,**

v.

**UNITED STATES of America, and Inter-
state Commerce Commission,
Defendants,**

and

**Ingram Corporation et al., Intervening
Defendants.**

**No. CV474–25.**

United States District Court,
S. D. Georgia,
Savannah Division.

July 19, 1974.

Walter C. Hartridge, Bouhan, Williams & Levy, Savannah, Ga., Jacob P. Billig, Terrence D. Jones, Billig, Sher & Jones, Washington, D. C., for Port Royal Marine Corp., and Combi Line, Prudential-Grace Lines, Inc. and Waterman Steamship Corp.

Walter C. Hartridge, Savannah, Ga., Ronald A. Capone, Kirlin, Campbell & Keating, Washington, D. C., for Central Gulf Lines, Inc.

Thomas E. Kauper, Asst. Atty. Gen., Carl D. Lawson, Arnold P. Lav, Dept. of Justice, Washington, D. C., R. Jackson Smith, Jr., Lamar C. Walter, Savannah, Ga., for the United States.

Fritz R. Kahn, Gen. Counsel, Hanford O'Hara, I. C. C., Washington, D. C., for I. C. C.

Malcolm R. Maclean, Ralph O. Bowden, III, Hunter, Houlihan, Maclean, Exley, Dunn & Connerat, Savannah, Ga., Donald Macleay, Peter A. Greene, Neal A. Jackson, Macleay, Lynch, Bernhard & Gregg, Washington, D. C., for Waterways Freight Bureau, S. C. Loveland Co., Inc. and Ingram Corp.

Ralph O. Bowden, III, Savannah, Ga., Warren Price, Jr., Paul J. McElligott, Ragan & Mason, Washington, D. C., for Sea-Land Service, Inc.

Before BELL, Circuit Judge, LAWRENCE, Chief District Judge, and ALAIMO, District Judge.

## DECISION OF THREE-JUDGE DISTRICT COURT

LAWRENCE, Chief District Judge.

Port Royal Marine Corporation seeks to set aside and enjoin the enforcement of an Order of the Interstate Commerce Commission declaring that it has regulatory jurisdiction over plaintiff's barge towage services to and from various ports in the Southeast.

Plaintiff initiated a proceeding before the Commission by requesting a Declaratory Order to that effect, pursuant to the Administrative Procedure Act, 5 U.S.C. § 554(e). The Interstate Commerce Commission found after a hearing that the LASH (Lighter-Aboard Ship) towage service rendered to ocean carriers constitutes transportation in interstate and foreign commerce and is subject to regulation under Part III of the Interstate Commerce Act, 49 U.S.C. § 901 et seq. See PORT ROYAL MARINE CORPORATION—DECLARATORY ORDER—"LASH" OPERATIONS, No. W-C-22, served 1/22/74, 344 I.C.C. 876.

On February 20, 1974, after a hearing in which plaintiff, the defendants and intervening defendants participated, the Chief Judge of this District granted Port Royal's motion to temporarily restrain the effectiveness of the Commission's order until further order. A three-judge court was designated to hear the case pursuant to 28 U.S.C. §§ 2321, 2325. Following the filing of briefs, the case was orally argued on June 24th before Judge Bell of the Fifth Circuit and Chief Judge Lawrence and Judge Alaimo of the Southern District of Georgia.[1]

---

1. The litigation has generated internecine conflict on the Government level. The United States through the Anti-Trust Division of the Justice Department takes the position that in subjecting Port Royal's towage of LASH vessels to I.C.C. jurisdiction, the defendant Commission misconstrued the concept of "transshipment" and placed a water transportation system which does not include "transshipment" within its jurisdiction without statutory authority. The Department of Transportation is not a party. However, in the proceedings before the Interstate Commerce Commission, which are part of the record here, DOT supported the position that no jurisdiction by the Commission exists over LASH operations. The Federal Maritime Commission which is not a party contended that while it has no jurisdiction over towage of LASH lighters, I.C.C. is also without jurisdiction since no transshipment occurred.

Part III of the Interstate Commerce Act deals with regulation of carriers by water. It does not confer jurisdiction in the Commission over movements from a place outside the United States to this country. However, statutory jurisdiction exists (a) as to that segment of water transportation taking place within the United States "prior to transshipment" occurring within this country in a movement to a place outside the United States and (b) as to that part of transportation by water taking place within the United States "after transshipment" occurring therein, following a movement from a place outside the United States.[2] See 49 U.S.C. § 902(i)(3)(B). Thus, where cargo moves by water from one place to another in the United States as part of an ocean voyage, the Interstate Commerce Commission possesses jurisdiction over a domestic segment thereof if such transportation was preceded by a "transshipment" of such cargo.

In the Declaratory Order as to the Port Royal operations, the Commission said that its failure "to exercise jurisdiction over LASH operations would be contrary to the underlying purpose of part III of the Act, which was designed to place inland water carriers under essentially the same regulatory controls as parts I and II carriers". The Commission concluded that § 302(i) of the Interstate Commerce Act, defining the meaning of interstate or foreign transportation as respects its jurisdiction over water carriers, requires assertion of regulatory control as to that portion of the transportation service taking place within the United States if there is "transshipment" of lading at a place in this country. Finding persuasive precedent in *Sacramento-Yolo*, 341 I.C.C. 105, the I.C.C. ruled that "although there may be no physical shifting of the cargo to another barge at the point where the mother ship is docked, a separate transportation service is in fact begun when the lighter is turned over to a towboat operator".[3]

What constitutes "transshipment" is of crucial significance in this litigation. On the interpretation and application of the term depends the validity of the Order of the Commission holding that it possesses regulatory power over Port Royal's water carrier operations under Part III of the Interstate Commerce Act. There are numerous dictionary definitions of "transshipment" in maritime usage, including that in Black's Law Dictionary, where the term is defined as "the act of taking the cargo out of one ship and loading it into another".[4] The difficulty of statutory

---

2. Section 302(i)(3)(B) of the Act subjects to the regulatory jurisdiction of the Commission

 "transportation . . . of . . . property . . . wholly by water . . . from or to a place in the United States, . . . in the case of a movement to a place outside the United States, only insofar as such transportation by water takes place from any place in the United States to any other place therein prior to transshipment at a place within the United States for movement to a place outside thereof, and, in the case of a movement from a place outside the United States, only insofar as such transportation by water takes place from any place in the United States to any other place therein after transshipment at a place within the United States in a movement from a place outside thereof."

3. The Commission also found a jurisdictional basis in that the LASH lighter itself, with or without contents, constitutes property which is transshipped between the mother vessel and the petitioner's tug or pushboats. The Act defines "common carrier by water" as any "transportation by water in interstate or foreign commerce of . . . property. . . ." 49 U.S.C. § 902(d).

4. Other definitions include: "The transfer of goods from the vessel stipulated in the contract of affreightment to another vessel before the place of destination has been reached.", International Maritime Dictionary (2d ed., 1961); "taking goods off of one vessel and loading them onto another. . . .", Dictionary of Maritime Insurance Terms (1964 ed.); "to change from one ship or conveyance to another", *Random House Dictionary of the English Language;* "transfer for further transportation from one ship or conveyance to another", *Webster's New International Dictionary.*

construction in this case grows out of the radical innovations in recent years in loading, carriage and delivery of cargo by ocean-going vessels. The heart of this litigation is the use of the so-called LASH concept. The word is an acronym of Lighter-Aboard-Ship. The system is another step in the technological progress in water transportation known as "containerization".

Prior to LASH, the most important innovation in the field was the introduction of the van-type container system utilizing containers that resemble the ordinary semitrailer body. Containerization involves rail, motor and water carriers for movement of the loaded and empty containers between inland origins and destinations and to and from docks alongside the ocean-going container ships. Its advantage lies in permitting cargo to be packed in a container at origin and moved to destination without rehandling or repacking although various carriers and modes of transportation may be involved in the movement.

In place of the van-type container, the LASH system utilizes a rectangular single-skin steel box, measuring approximately 61½ feet by 31½ feet by 14 feet. The container has a cargo capacity of approximately 370 tons. It functions as a lighter or barge upon reaching the water after discharge from the mother ship by means of a massive travelling deck crane. Lighters can be tied together with other LASH barges and towed along protected waterways over substantial distances; in fact, to any point on a river with a minimum depth of nine feet. The lighters are documented vessels and carry their registry papers aboard. They are owned by the mother vessel or by another LASH carrier.

A lighter constitutes a small floating cargo hold equipped to be lifted bodily on and off the ship. The barge-containers are loaded with various types of cargo at ports in the United States destined for delivery to foreign countries or are loaded at foreign ports with cargo destined for points in the United States. They have no independent means of propulsion. The lighters are towed or pushed by tugboats which in the instant case are furnished and operated by Port Royal under contract with the LASH shipowner.[5]

A typical LASH operation begins with the arrival of the ocean-going mother ship at a central mooring point which in this case is a Georgia Ports Authority facility located on Cockspur Island near the mouth of the Savannah River. The floatable container, carrying the same cargo stored therein at the foreign port, is lowered by specialty mechanism to the water whereupon it assumes the dual status of barge and cargo container. Port Royal's towboats convey the container-lighters from the ship to an assembly area upstream and from thence push the barges to destination at various Southeastern ports, including Savannah, Charleston, Wilmington, Brunswick and Jacksonville. The cargo is removed at its destination from the lighter which is then reloaded (or returned empty) and is towed by tug back to the central mooring point where the barge is lifted aboard the mother ship thereby losing its vessel function and becoming part of the cargo of the LASH ship on her return voyage.

The originator of the LASH system is Jerome L. Goldman, a naval architect of New Orleans. He says that the concept originated in his conviction that greater improvements in ship cargo handling and port turn-around were required to increase the efficiency of the maritime trade. According to Mr. Goldman, "By

5. Port Royal does not offer services to the public. It provides LASH towage service to ocean common carriers which are subject to the jurisdiction of the Federal Maritime Commission. It is paid an agreed fee for this service. Port Royal does not have an I.C.C. certificate for its water transportation service. The LASH movements it handles for the ocean carrier are under a through bill of lading from origin to destination. The shipper is unaware of Port Royal's participation in the inland movement of the cargo.

utilizing LASH lighters from which the cargo was not removed until destination, cargo handling in the LASH system is drastically reduced, and the transfer of cargo from one vessel to another vessel, or transshipment, is eliminated." [6] See proceedings before the Interstate Commerce Commission in No. W–C–22 which are part of the record in this Court. All of the parties to this litigation recognize the importance of the system and the resulting substantial reduction in handling costs. The LASH operations are already substantial and are growing rapidly. Apparently, its expansion has had a competitive impact on import and export movements by carriers using conventional barges. The defendant intervenors complain that the concept of fair and impartial regulation of all modes of transportation would be lost if a selected group of carriers whose operations do not essentially differ from carriers subject to Part III of the Act should be exempted from regulation while competing operations between like points and performed by other water carriers remain subject thereto.

The imperious question of statutory construction underlying this litigation receives scant aid from the legislative history of Part III of the Act.[7] Little light also comes from any judicial and administrative decisions defining the term "transshipment". The one most discussed by counsel is the 1972 decision of the Interstate Commerce Commission in Sacramento-Yolo Port District, 341 I.C.C. 105. There its jurisdiction was challenged on the ground that no "transshipment" occurred when a barge service moved van-type cargo containers from ships between the port of Sacramento and other ports in the area. The Commission said that the closest any case came to a definition of the word was the uncontroverted statement in Grace Lines, Inc., Common Carrier Application, 310 I.C.C. 685 (1960) that "the authorities are unanimous in concluding in transshipment, there must be a transferral from one vessel to another." It concluded that Congress borrowed the term

"from its use in the maritime trade and meant it to be applied in its prevailing commercial sense to mark the line where our jurisdiction begins and ends with respect to waterborne commerce. Thus, this Commission must hold that the transfer of lading among vessels is sufficient to bring the inland water movement within the jurisdiction of this Commission."

The Commission ruled in Sacramento-Yolo that it possessed regulatory jurisdiction over the transportation service involved.[8]

6. The idea of carrying cargo on a vessel in a number of independent floating modules (that is, detachable units with a specific function) is an old one in the industry. More than 90 years ago, a vessel was built in Great Britain adapted to such a concept. See "LASH SHIP PROGRESS", Shipping World and Shipbuilder (Jan. 1972), p. 79.

7. The Senate Report on the proposed Transportation Act of 1940 stated that its purpose was not favoring "one form of transportation over another or seeking to put any form of transportation out of business; it is, as stated, simply to put them on one common basis or starting point in the sharp struggles for business. . . . " S.Rep.No. 433, 76th Cong., 1st Sess. (1939), p. 3.

8. As an aftermath of the Sacramento-Yolo decision, hearings were held in 1972 before the House Subcommittee on Merchant Marine. Out of them evolved a bill which passed the House of Representatives on April 2, 1974 (H.R.12208). It is now before the Senate Commerce Committee. The legislation provides that rates and charges for barging and affreighting containers or containerized cargo between points in the United States shall be filed with the Federal Maritime Commission in the case of a terminal operator on the Pacific coast which is a State, municipality or public body. It also requires filing of rates and charges with the Maritime Commission where "the transportation by barge between points in the United States is furnished by a terminal operator as a service substitute in lieu of a direct vessel call by the common carrier by water transporting the containers or containerized cargo under a through bill of lading." This provision does not cover a LASH operation. The proposed legislation therefore does not affect the regulatory power of I.C.C. over such type of transportation when transshipment has occurred.

The controversy in the present case does not have to be determined by a war over dictionary definitions—a logomachy in which the palm goes to the meaning that best serves the judicial purpose. To be sure, the words of a statute are to be construed in the light of their natural, ordinary and familiar meaning. Malat v. Riddell, 383 U.S. 569, 571, 86 S.Ct. 1030, 16 L.Ed.2d 102; First National Bank of Cincinnati v. Flershem, 290 U.S. 504, 54 S.Ct. 298, 78 L.Ed. 465; United States v. 525 Company, 342 F.2d 759, 761 (5th Cir.). Congress used the term "transshipment" to delineate the bounds of the Interstate Commerce Commission's jurisdiction in certain cases. That concept was selected as the most practical dividing line between a nonregulated foreign movement and a regulated domestic segment thereof. Whatever traditional meaning "transshipment" possesses, in construing the Act courts may adopt broader interpretations than those "to be drawn from mere dictionary definitions of the words employed by Congress." Piedmont & Northern Railway Co. v. Interstate Commerce Commission, 286 U.S. 299, 311, 52 S.Ct. 541, 545, 76 L.Ed. 1115.

We agree with the Commission that "The transfer of a LASH lighter from the mother vessel to a towboat operator is not materially different from the transfer of a container to a barge as was the situation in *Sacramento-Yolo*." See Port Royal Marine Corporation— Declaratory Order, *supra*, 344 I.C.C. at 881. There is a distinction in method but no difference in result, as far as regulatory jurisdiction is concerned, between discharge from a vessel of a container onto a floating barge and the discharge and tow of a container which itself floats on reaching the water.

It is hard to believe that Congress intended that technological advances in water transportation (such as the LASH system) would deprive the I.C.C. of regulatory power over movements of waterborne barge-containers discharged from a sea-going vessel which are then towed through inland waters of the United States to destinations as far as 1,000 miles upstream. Such transportation is hardly to be regarded as *incidental* service to the ocean movement and we are not persuaded by the cases cited in support of such contention. See Swift & Company v. The Gulf and South Atlantic Havana Steamship Conference, 6 F.M.B. 215 (1961), aff'd. 113 U.S. App.D.C. 117, 306 F.2d 277; Carroll Towing Co., Inc., Contract Carrier Application, 250 I.C.C. 417 (1942); Moran Towing & Trans. Co., Inc., Applications, 250 I.C.C. 541 (1942); Evans Transp. Corp., Contract Carrier Application, 250 I.C.C. 496 (1942).

Swift & Company v. The Gulf and South Atlantic Havana Steamship Conference, *supra*, dealt with a barge movement from St. Louis to Havana in which the means of propulsion changed at New Orleans from a river tug to an ocean-going tug. There was no transfer of cargo and the movement was continuous. The Commission held that no new shipment commenced from a Gulf port when the means of propulsion changed from one type of tug to another. *Carroll* involved docking and undocking service and towage service within New York harbor and contiguous harbors. The Commission found that docking and undocking did not involve transshipment and that the towage service was incidental to transportation and not subject to I.C.C. jurisdiction, representing performance of services "within terminal areas". See 49 U.S.C. § 903(f)(2).

*Evans* dealt with Commission jurisdiction over lighterage of shipments moving in foreign commerce between vessels in the harbor of New York. The Commission concluded that Congress had left to the Maritime Commission the regulation of the matter of "terminal transportation" in respect to foreign commerce. *Moran* involved docking, undocking, shifting of vessels and performance of various towage service in New York harbor and contiguous harbors and the Commission ruled that its operations were not subject to I.C.C. regulation under Part III.

In De Bardeleben Coal Corporation v. United States, 54 F.Supp. 643 (W.D., Pa.), a substantial part of a line-haul barge tow operation was performed by a tower on behalf of a water common carrier. The three-judge court said that the towage was an incidental service and that such transportation was not confined by Section 303(f)(2) to barge or lighterage service occurring within "terminal areas". "The crucial thing," said the district court, "is that the particular service performed for a carrier subject to the Act is towage rather than the length of the towage . . . To the extent that the tower performs such service for another carrier, the tower needs no certificate." 54 F.Supp. at 648. It was held that the exemption contained in Section 303(f)(2) of the Act has reference to incidental service performed by a carrier which is subject to regulation under Part III. In the instant case, the owner of the LASH vessel is not a carrier regulated by I.C.C. and Port Royal which performs the "incidental" towage service maintains that its transportation operation is exempted from regulation under the Act of 1940.

The statutory setting and underlying facts in these and other authorities cited vary widely from the LASH operation in the present case. The average lighter-mile per barge towed by Port Royal in a three months period beginning November 1, 1973, was 161 miles. LASH container movements are made from the mooring point on the Savannah River as far south as Port Everglades and as far north as Morehead City. Administrative rulings may be analyzed, analogized and differentiated but one inevitably returns to the sovereign issue as to construction of Section 302(i)(3)(B) of the Act. Was there a *transshipment* of LASH cargo that demarked the termination of the ocean movement and the beginning of a separate inland water transportation operation subject to I.C. C. regulation?

 The movement of cargo by ocean-going vessels to a central mooring point in this country where floatable cargo containers are discharged from the mother ship and are towed by tug to destination may not constitute "transshipment" in the traditional sense. But that term, as employed in Part III, is neither a word of art nor one to be parochially construed. Transshipment contemplates a significant, identifiable change in the nature, the mode and the conveyance used in the carriage of cargo. The statutory meaning of transshipment has the capacity to accommodate itself to technological advances transforming the method thereof although producing the basic result obtained by traditional means in the transshipping of cargo.[9]

At times the arguments of counsel approach the metaphysical. The subject would have intrigued the Schoolmen of the Middle Ages. Plaintiff seems to contend that no transferral of the lading occurred because it remained in its lighter-container until unloaded at destination and that while the container was transported, the lading within it was not transferred to any vessel. Ergo, there was no transshipment. Even if there were a transferral of cargo (the argument continues), the lading was not shifted to another vessel since it remained in the same container that became a lighter on contact with the water. An intervening defendant, Sea-Land Service, Inc., replies in kind. To elaborate on its theory, when the LASH lighter carrying a return cargo reaches the mother ship following its inland movement, it arrives as a registered vessel but, hoisted aboard, a metamorphosis occurs and the vessel is transposed into a mere cargo container. Thus, says Sea-Land, there was a transfer of lading from one vessel to another vessel.

9. Regulatory jurisdiction over an activity is not necessarily lost because technology brings about fundamental changes in the character of the thing regulated. See United States v. Southwestern Cable Co., 392 U.S. 157, 171–172, 88 S.Ct. 1994, 20 L.Ed.2d 1001.

Port Royal falls back to a prepared position in event that the element of transshipment is found to exist. It insists that the service furnished by Port Royal is merely incidental to the foreign movement of the cargo on the LASH mother ship and the transportation of container-lighters to destination (and return) is merely ancillary to the prime ocean movement.[10] It is stressed that Port Royal does not solicit the business, does not know what was in the containers, issues no bills of lading, and that the through bills issued by the LASH shipowner make the latter completely responsible to shippers from origin to destination.

Under these circumstances, plaintiffs argue that Port Royal is but an agent in the transportation operation in question.[11] So it is, but it is a contract carrier by water and as such performs an indispensable function in the movement of LASH lighters which are without independent motive power.[12] Unquestionably, the cargo stored in the container-barges is turned over to the exclusive control of Port Royal's towing vessel and remains in its care until the lighters are returned to the mother ship when control is surrendered to her owner.

In arguing the respective claims of the parties as to construction of the § 302(i)(3)(B) of the Act, counsel press upon us interpretational factors such as statements of I.C.C. officials at Congressional hearings and formal declarations of Commission policy claimed to be at variance with the position taken in the Port Royal case.[13] Prior assertions by responsible agency officials in derogation of current jurisdictional contentions are often of makeweight significance as far as judicial interpretation is concerned. For its

---

10. The brief filed by the United States points out that foreign-built LASH barges are prohibited by law from being documented for transportation by water of merchandise between points in the United States. 46 U.S.C. § 883. Since the lighters are registered as vessels, it is argued that inland transportation in the barges is necessarily an incident of the foreign movement as otherwise they would not be documented for a separate and new transportation service. Factors and considerations that may influence the action or views of one government agency do not affect the administration of the law by another agency to which Congress has delegated jurisdiction over the specific matter in litigation.

11. Plaintiff's "agency" argument may have some relation to Mr. Goldman's statement in the I.C.C. case that transshipment requires a transfer of responsibility by one carrier to another *vis-a-vis* the shipper. In adopting the transshipment concept as a break-off point in foreign movements, Congress was not construing a clause in a bill of lading or dealing with the rights and obligations of shippers and carriers by water. It was drawing a line of jurisdiction. See Cornell Steamboat Co. v. United States, 321 U.S. 634, 636–637, 64 S.Ct. 768, 88 L.Ed. 978.

12. Part III regulates "contract carriers by water" which are defined as any person who, under contract or agreement, engages in the transportation by water of passengers or property in interstate or foreign commerce for compensation. 49 U.S.C. § 902(e).

13. At the hearings before the Subcommittee on Merchant Marine of the House, the General Counsel of the Interstate Commerce Commission, Fritz R. Kahn, testified that "the off-loading of cargoes from one vessel to another inescapably constitutes transshipment". p. 30. He further stated, " . . . with respect to the new vessels that hopefully will permit a revitalization of the United States maritime commerce, the LASH vessels, the Interstate Commerce Commission is prepared to say that the movement of the mother vessel from Manila to San Francisco and its barges from San Francisco to Sacramento, remains exclusively within the jurisdiction of the Federal Maritime Commission, and we would have no difficulty with that." p. 31. At the time of the hearings before the Subcommittee, the I.C.C. and F.M.C. were engaged in an effort to reach an understanding as to the matter of jurisdiction over LASH operations. As a result, a joint statement was issued in May, 1972, on that subject which stated in part, "For purposes of this statement of policy the transfer of cargoes from one barge to another barge of the same mother vessel . . . shall not be deemed to constitute transshipment. However, the towage of barges between the United States ports, when undertaken by other than the ocean carrier, is subject to the jurisdiction of the Interstate Commerce Commission."

part, the I.C.C., denying any inconsistency, makes capital of the failure of Congress in 1972 to pass certain bills which would have placed LASH operations under Maritime Commission jurisdiction.[14] However, Congressional failure to enact corrective or proposed legislation can be an unreliable indicia of the meaning of a prior statute. See American Trucking Associations, Inc. v. Atchinson, Topeka & Santa Fe Railway Co., 387 U.S. 397, 418, 87 S.Ct. 1608, 18 L.Ed.2d 847; 73 Am.Jur.2d Statutes § 171, p. 375.

The Declaratory Order in the Port Royal case states that failure by the Commission to exercise jurisdiction over LASH operations would defeat the underlying purpose of Part III of the Act "which was designed to place inland water carriers under essentially the same regulatory controls as Parts I and II carriers". The Order points out that the movement in lighters of nonbulk commodities is in direct competition with the transportation of similar commodities in conventional barges by regulated water carriers. After a review of the legislative history, the Commission concluded that the construction advanced by petitioner would contravene the intent of Congress to cover "the transfer of lighters between an ocean vessel and an inland towboat, as a 'transshipment', so as to subject the inland towage to regulation". 344 I.C.C. at 881, 882.[15]

The intervening defendants[16] call attention to the "ludicrous consequences" of Port Royal's interpretation. They hypothesize the case of two shipments of the same commodity arriving at New Orleans in a LASH ship and destined for Chicago. Part of the shipment of the cargo consists of van-type containers off-loaded from a LASH vessel into conventional barges for movement to Chicago. The other part consists of LASH container-barges similarly off-loaded for inclusion in the same water movement. The latter movement would not be subject to I.C.C. regulation while the van-type movement would be subjected to regulation at published tariff rates.

The intervening defendants argue that the conventional barge service of regulated carriers could not compete with towage of LASH container barges since the LASH operators would be free to adjust rates beneath that of the regulated carrier.[17] Sea-Land Service describes the immense impact upon it of any reversal of the I.C.C. decision which would result in the exemption from regulation

---

14. Two bills were introduced in the 92nd Congress that were opposed by the Interstate Commerce Commission whose Chairman asserted that the effect thereof would be to "virtually nullify" the jurisdiction of I.C.C. over domestic barge movements as part of the transportation in foreign commerce. The House Committee on Merchant Marine and Fisheries did not report the bill out as introduced but limited the legislation to the Sacramento-Yolo situation.

15. Cf. Cornell Steamboat Co. v. United States, supra, 321 U.S. 634, 637, 64 S.Ct. 768, 770 in which a tower of barges contended that its tugboats were not "water carriers" within the meaning of Part III of the Commerce Act. Denying such contention, the Supreme Court said: "Cornell is in active competition with other types of interstate water carriers as well as with trucks and railroads. Therefore, if Cornell's particular method of providing water transportation facilities for others is not subject to regulation under the Act, it would appear to present an anomolous exception to the Congressional plan for regulation of competing transportation activities. We conclude that the language of the Act brings Cornell's business within its coverage, and that to construe the Act otherwise would frustrate the purpose of Congress."

16. They are Sea-Land Service, Inc. which is engaged in domestic and foreign containership operations; S. C. Loveland Co. which holds operating authority from I.C.C. to provide the services at issue here; Ingram Corporation which holds contract carrier authority from the Commission to perform LASH towage operations on portions of the inland waterway, and Waterways Freight Bureau whose membership includes common carriers by barge on the Mississippi and connecting inland waterways.

17. Port Royal's charge for its LASH towage services is not separated or identified in the through rate established by the ocean carrier.

of all domestic water carriers providing services to LASH vessels.[18] The intervening defendants assert that it would place them at a competitive disadvantage. They complain that they are foreclosed from participation in such traffic as a result of the unregulated competition of Port Royal and other LASH agents. See 344 I.C.C. 885ff., Appendix.

On the other hand, Port Royal asserts (affidavit of E. W. B. Winnett) that 99% of its business is derived from the towage of LASH lighters and that it would have to shut down its operations until the Commission certificates same in event its Declaratory Order should be sustained. The ocean carriers engaged in LASH operations insist that efficiency requires that the LASH mother vessel not be restricted to the use of only certificated tugboat operations. The United States informs this Court that the Interstate Commerce Commission has so interpreted its authority as to endanger the existence and growth of independent towage operators in favor of fully integrated ocean carrier-towage firms.

The intervenor-plaintiff, Central Gulf Lines, Inc., urged in the Port Royal case that the new barge system not be strangled at infancy by unwarranted towage regulations. The Department of Transportation contended before the I.C.C. that assertion of jurisdiction would affect the development of LASH transportation service by requiring Port Royal to obtain a certificate of public convenience and necessity from the Interstate Commerce Commission.

Parts of the foregoing resume are irrelevant to the point at issue while others address themselves to the legislative rather than the judicial branch. It serves, however, as an introduction to an issue that cropped up in the course of the oral argument. A member of the three-judge court inquired whether the regulatory power of the Federal Maritime Commission extends to plaintiff's LASH operations. "Assuming that Port Royal needs regulating, that Congress thinks it's in the public interest that they be regulated, how could they, the Federal Maritime Commission regulate Port Royal?" Counsel for the plaintiffs replied that it could while counsel for the intervening defendants took the opposite view. We directed submission of briefs confined to whether the F.M.C. can assert direct regulatory jurisdiction over Port Royal's towage charges.[19]

The Shipping Act of 1916 prohibits common carriers by water in foreign commerce from charging or collecting rates or charges which are unjustly discriminatory between shippers or ports or prejudicial to exporters of the United States. Common carriers by water in interstate commerce are required to establish and enforce just and reasonable rates and charges; to file same with the Federal Maritime Board (Commission) and are prohibited from charging or collecting greater compensation for such transportation than the rates and charges so filed with the Commission. 46 U.S.C. §§ 816, 817.

While the Shipping Act generally relates to common carriers by water, its regulatory features apply to other persons who are subject to the legislation. The phrase "other persons subject to this chapter" appears in several places in the legislation. They are defined as "any person not included in the term 'common carrier by water,' carrying on the business of forwarding or furnishing wharfage, dock, warehouse, or other terminal facilities in connection with a common carrier by water". 46 U.S.C. § 801.

---

18. The intervening defendants appear to be in competition with Prudential-Grace Lines, Combi Lines, Waterman Steamship Corporation, Central Gulf Steamship Company and others. Apparently S. C. Loveland Co. and perhaps other carriers furnish inland barge services to points along intercoastal waters north and south of Savannah.

19. In the I.C.C. submission by the Maritime Commission in the Port Royal case in January, 1973, the statement was made that it "does not contend, based upon the description of Port Royal's service which appears in the petition, that it bears some direct regulatory responsibility for Port Royal's service. . . . "

The supplemental briefs of the plaintiffs and of the United States contend that Port Royal is an "other person subject to this chapter" within the meaning of the Shipping Act. Counsel attribute a broad meaning to the term "terminal facilities" in relation to the carrying on of certain types of business by an "other person". An affidavit by the President of Port Royal Marine Corporation states that the Company provides to ocean carriers "a fleeting facility" for the LASH lighters, made up of "specially designed buoys held by a custom design multiple anchor system". The "facility" referred to is located in a sheltered area of the Savannah River off Hutchinson Island some twelve miles upstream from the mooring point of the mother ships near the mouth of that River. Outbound LASH lighters are held in the "fleeting" area prior to being hoisted on the vessel. In the case of inbound movements they are first moved to the "fleeting facility" for the purpose of being marshaled into tows. Plaintiffs maintain that the area is in the nature of a "terminal facility" furnished to ocean common carriers and that in operating such facility, Port Royal is an "other person subject to this chapter" and therefore to F.M.C. rate regulation.[20]

The intervening defendants point out that Port Royal is not a common carrier and argue that it cannot be an "other person subject to this chapter" since it is not a freight forwarder; because towing and lightering services are excluded from the definition of certain covered business activities,[21] and since Port Royal's "fleeting facility" is not a "terminal facility" within the meaning of the "other person" provision of the Shipping Act. If Port Royal is carrying on the business of furnishing "terminal facilities", it is required to file with the Maritime Commission tariffs of its rates, charges, rules and regulations. See 46 CFR §§ 533 et seq. This has never been done by plaintiff nor has F. M.C. ever insisted that it do so. Jurisdiction has neither been claimed nor exercised by the Maritime Commission in such cases.

We reject Port Royal's argument that because F.M.C. possesses exclusive jurisdiction over ocean carrier rates, such authority extends to plaintiff's charges (which are included but not shown) for towage claimed to be incidental to the foreign movement. The Interstate Commerce Act repealed the Shipping Act of 1916 and the Intercoastal Shipping Act of 1933 (46 U.S.C. § 843 et seq.) "insofar as they are inconsistent with any provision" of Part III providing for regulation of transportation of property by water in commerce which is under the jurisdiction of the Interstate Commerce Commission. See 49 U.S.C. § 920(a).

The Shipping Act is clearly inconsistent with 49 U.S.C. § 902(i) (3)(B) if a "transshipment" of property occurs. We conclude that cargo stored in LASH containers is transshipped when same is discharged from the mother vessel and the barge-containers are turned over to the towboat carrier for transportation to inland destinations at other ports or places by a different mode of conveyance and means of propulsion. In the reverse movement, transshipment occurs upon the transfer of the outbound cargo-bearing lighter-containers aboard the mother ship.

The Interstate Commerce Commission properly held that it has regulatory ju-

---

20. In defining "port terminal facilities" the F.M.C. Regulations state that they consist of structures comprising a terminal unit, and including, but not limited to, wharves, warehouses, landings and "receiving stations used for the transmission, care and convenience of cargo and/or passengers in the interchange of same between land and water carriers or between two water carriers". 46 C.F.R. § 533.6(b).

21. Tugboat and lighterage services are not subject to Maritime Commission jurisdiction. See A. P. St.Philip, Inc. v. The Atlantic Land & Improvement Co., 13 F.M.C. 166, 171–172; Rates Between Places in Alaska, 3 U.S.M.C. 7, 9.

risdiction over Port Royal's LASH operations under Part III of the Act.[22]

This is a case of first impression and is one of significance to the shipping industry. Legislative and executive agencies of the United States have taken conflicting positions in the litigation. The ruling by this Court will probably be appealed to the Supreme Court. Under these circumstances, we think that exercise of regulatory jurisdiction by the Interstate Commerce Commission over Port Royal's LASH operation should be stayed pending appeal. The restraining order granted by Chief Judge Lawrence on February 20, 1974, pursuant to 28 U.S.C. § 2324, will therefore not be dissolved at this time. It will operate as a stay of the Commission's Declaratory Order until further direction of this Court.

The Clerk will issue judgment accordingly.

---

22. It seems to be conceded by the Interstate Commerce Commission that jurisdiction over the movement of LASH lighters from the mother ship to and from the Port of Savannah is excluded under Section 303 of the Act.